Lawrence M. Rolnick (NY Bar No. 2024784)
(*pro hac vice* forthcoming)
lrolnick@rksllp.com
Marc B. Kramer (NY Bar No. 2167146)
(*pro hac vice* forthcoming)
mkramer@rksllp.com
Steven M. Hecht (NY Bar No. 2522647)
(*pro hac vice* forthcoming)
shecht@rksllp.com
Michael J. Hampson (NY Bar No. 4699120)
(*pro hac vice* forthcoming)
mhampson@rksllp.com
**ROLNICK KRAMER SADIGHI LLP**
1251 Avenue of the Americas
New York, NY 10020
(212) 597-2800

Scott L. Metzger (Bar No. 089718)
metzger@dmwplc.com
John C. Wynne (Bar No. 083041)
wynne@dmwplc.com
**DUCKOR METZGER & WYNNE,**
A Professional Law Corporation
101 West Broadway, Suite 1700
San Diego, California 92101
(619) 209-3000; (619) 209-3043 fax

Attorneys for Plaintiffs
HBK MASTER FUND L.P. and
HBK MERGER STRATEGIES MASTER FUND L.P.

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| HBK MASTER FUND L.P. and HBK MERGER STRATEGIES MASTER FUND L.P.<br><br>Plaintiffs,<br><br>v.<br><br>MAXLINEAR, INC., KISHORE SEENDRIPU and STEVEN LITCHFIELD,<br><br>Defendants. | Case No. '24CV1033 JLS MMP<br><br>**COMPLAINT AND JURY DEMAND** |

**<u>COMPLAINT AND JURY DEMAND</u>**

# TABLE OF CONTENTS

page


I. SUMMARY OF THE ACTION ........ 5

II. JURISDICTION AND VENUE ........ 12

III. PARTIES ........ 12

A. Plaintiff ........ 12

B. Defendants ........ 13

C. Relevant Non-Party ........ 15

IV. OVERVIEW OF THE FRAUD ........ 16

A. MaxLinear's Growth Strategy ........ 16

B. MaxLinear Announces the "Transformative" $3.8 Billion Silicon Motion Acquisition ........ 17

C. MaxLinear Gives the Market The Impression That The Only Condition To The Merger's Completion Was SAMR Regulatory Approval ........ 18

D. The Merger Agreement Does Not Allow MaxLinear To Simply Back Out Of The Deal ........ 20

E. Defendants Falsely Assure Investors They Will Complete The Merger If Regulatory Approval Is Received Even Though Defendants Had Already Decided To Abandon The Deal ........ 23

F. Prior to June 28, 2023, MaxLinear Determines to Abandon The Merger ........ 29

G. The Truth Is Revealed: Just Hours After SAMR's Approval, MaxLinear Backs Out Of The Deal And Causes Silicon Motion ADSs To Lose Nearly Half Their Value ........ 32

H. Subsequent Developments Further Confirm The Fraud ........ 36

I. Publicly Available Accounts Of Former MaxLinear Employees Confirm Defendants Had No Intention Of Closing The Merger ............. 37

V. MATERIALLY FALSE AND MISLEADING STATEMENTS ............. 43

VI. ACTS IN FURTHERANCE OF DEFENDANTS' SCHEME ............. 49

VII. ADDITIONAL SCIENTER ALLEGATIONS ............. 52

VIII. ADDITIONAL MATERIALITY ALLEGATIONS ............. 59

IX. PLAINTIFFS' ACTUAL RELIANCE ............. 59

X. APPLICATION OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET ............. 60

XI. LOSS CAUSATION ............. 61

XII. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE ............. 63

XIII. CLAIMS FOR RELIEF ............. 64

FIRST CAUSE OF ACTION ............. 64

SECOND CAUSE OF ACTION ............. 65

THIRD CAUSE OF ACTION ............. 67

FOURTH CAUSE OF ACTION ............. 68

FIFTH CAUSE OF ACTION ............. 69

SIXTH CAUSE OF ACTION ............. 70

SEVENTH CAUSE OF ACTION ............. 71

XIV. PRAYER FOR RELIEF ............. 72

XV. JURY DEMAND ............. 72

Plaintiffs HBK Master Fund L.P. and HBK Merger Strategies Master Fund L.P. (the "HBK Funds" or Plaintiffs") by their undersigned counsel, bring this action for violations of Sections 10(b), 18 and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5, as well as violations of the common law and the statutes of California against MaxLinear, Inc. ("MaxLinear" or the "Company"), Kishore Seendripu ("Seendripu"), and Steven Litchfield ("Litchfield") (collectively, "Defendants").

Plaintiffs allege the below based upon their personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters based on the investigation conducted by and through counsel, which included, among other things, review and analysis of: (a) MaxLinear's and Silicon Motion's public SEC filings; (b) press releases, reports, and postings posted by MaxLinear and Silicon Motion on their websites; (c) MaxLinear and Silicon Motion investor communications, conference calls, and investor presentations; (d) research reports relating to MaxLinear and Silicon Motion by securities, financial, and semiconductor industry analysts; (e) news articles and media reports concerning MaxLinear and Silicon Motion, including their failed merger (the "Merger"); (f) public data reflecting MaxLinear's and Silicon Motion's equity securities prices; (g) filings in the securities class action Water Island Event-Driven Fund, et al., v. MaxLinear, Inc., et al. 23-cv-01607 (S.D. Cal.); and (h) additional material and data concerning Defendants, Silicon Motion, and the global semiconductor markets.

Plaintiffs' investigation is ongoing, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations in this complaint after a reasonable opportunity for discovery.

///

## I. SUMMARY OF THE ACTION

1. This is a securities action concerning a scheme by MaxLinear and the individual defendants to avoid a merger they no longer wanted to effectuate while leaving shareholders of the target company – Silicon Motion – holding the bag. Rather than reveal their hidden intention to break the merger agreement (and face the consequences, including being subject to specific performance or an immediate payment of the breakup fee) MaxLinear lied to investors for months to convince them that if Chinese regulatory approval was achieved, the merger with Silicon Motion was, in fact, going to occur. In reality, MaxLinear either identified or concocted material adverse events, and then much later, only after regulatory approval was secured, dropped a bombshell on the marketplace that it was terminating the Merger. Silicon Motion's stock fell in response. MaxLinear's scheme was a straightforward attempt to lay as much of the loss of MaxLinear's change of heart as it could on the shareholders of Silicon Motion while MaxLinear attempted to give itself the strongest leverage possible to avoid specific performance and contest the contractual termination fee it had agreed to. The scheme was all the more cynical as the shareholders of Silicon Motion were future shareholders of MaxLinear – if only the merger had been completed.

2. On May 5, 2022, MaxLinear, a United States based microchip company and Silicon Motion, a Taiwan-based chip manufacturer, announced that MaxLinear would acquire Silicon Motion for $3.8 billion in cash and stock. Silicon Motion shareholders would thus receive both some cash and a stake in the future of the combined company – they were, at that moment, future MaxLinear shareholders.

3. The Merger consideration was nearly a 50% premium to Silicon Motion's stock price when announced. Defendants presented the deal as positive for MaxLinear's current shareholders as well. They asserted the deal would be "immediately and materially accretive" to MaxLinear's operating income, allow for "increased capacity" for the Company's "expansive and diverse technology," and

offer "an opportunity to really expand" MaxLinear's geographic reach, particularly in Asia.

4. The Merger faced two fundamental risks. First, that regulatory approval would not be achieved, and second, that one of the parties would break the agreement. During the relevant period, Defendants represented to Silicon Motion investors, and took acts consistent with those representations, that MaxLinear was fully committed to the Merger, would not break the Merger, and that as soon as approval was obtained from the State Administration for Market Regulation ("SAMR")—China's main antitrust regulator—the Merger would close. Defendants thus encouraged the market to view the merger as having only *one* risk – regulatory approval – not two, by taking the second risk off the table. (Of course, it would make no sense for Silicon Motion to break the merger agreement given that it was receiving a substantial premium.) Silicon Motion analysts understood this dynamic, with their commentary on the odds of merger completion focused entirely on regulatory approval and not at all on the possibility of an about-face by MaxLinear.

5. Investors, including Plaintiffs, were focused on (i) what MaxLinear said and did with respect to the Merger, including with respect to regulatory approval; and (ii) whether the relevant Chinese regulator, SAMR, would grant approval of the Merger. Meanwhile, Defendants continued to promote the synergies and other expected benefits of the Merger and emphasized that MaxLinear would complete the Merger once SAMR approved the deal.

6. On a May 3, 2023, call with analysts to discuss the Merger, MaxLinear affirmed its commitment to the Merger. During that call, an analyst from Alliance Global Partners Merger Arbitrage Group asked MaxLinear about the progress of the Merger, and specifically, SAMR approval. MaxLinear's Investor Relations point person, Leslie Green, ("Green"), responded by confirming the Merger and that the prospects for regulatory approval within the anticipated mid-2023 timeframe were on-track, stating: "***we continue to actively work to get the deal closed by mid-year,***

***which was always the time frame that we expected***." When the analyst followed up by asking whether MaxLinear "remain[ed] committed to acquiring [Silicon Motion]" and whether "[n]othing's changed there," Green, on behalf of the Company, unequivocally confirmed MaxLinear's commitment to completing the Merger once SAMR approved the deal, stating: "***No, nothing's changed there.***"

7. On June 2, 2023, Roth MKM hosted a webinar with Defendant and MaxLinear CFO Steven Litchfield, as well as Green. During the webinar Defendants publicly re-affirmed MaxLinear's commitment to the Merger. They asserted that there were no issues with the deal (except pending Chinese regulatory approval), that they were excited about the acquisition, and that the rationale for it was stronger than ever. In response to a direct question about whether a cyclical downturn in technology and semiconductors altered MaxLinear's conviction in the deal, the MaxLinear representatives said that MaxLinear was still very interested in SIMO as an asset.

8. Roth analyst Suji Desilva reported in an analyst report following the webinar that MaxLinear management was still committed to seeing the Silicon Motion deal go through. That analyst report was picked up by business press who also reported, based on the analyst report and management's comments at the webinar, that Chinese approval was the "last hurdle for completion."

9. On June 6, 2023, at the Stifel Cross Sector Insight (CSI) conference in Boston, Massachusetts (the "Stifel Conference"), Defendants again reaffirmed MaxLinear's commitment to closing the Merger. During the Stifel Conference—the transcript of which MaxLinear filed with the SEC—Defendant Seendripu assuaged investors during a "fireside chat" that "***the basic rationale [for the Merger] has not changed at all***"; that Silicon Motion remained "***a very strategic asset for [MaxLinear]***"; and MaxLinear was still "***very, very, . . . bullish***" that the Merger would provide all of the "***synergies that we told you all about***." Defendant Seendripu

did not mention a material adverse event and did not disclose MaxLinear had no intention of completing the merger.

10. Between June 2 and June 21 2023, Defendants continued to cause MaxLinear to take steps in the scheme, submitting items to SAMR but knowing that it was third-party feedback, not whatever MaxLinear was submitting, that would be determinative for SAMR. MaxLinear thus kept up the ruse.

11. On June 28, 2023, Defendants took their largest step in the scheme. They refiled, together with Silicon Motion, their application for U.S. antitrust approval under the Hart-Scott-Rodino Antitrust Improvements Act (the "HSR Act"), a step taken to reassure Silicon Motion investors that only Chinese approval (and certainly not MaxLinear's cold feet) stood in the way of the deal. This occurred well after the May 5, 2023 "First Outside Extended Date."

12. On the same day, Defendants filed a form 8-K with the SEC that reaffirmed the Company was actively pursuing regulatory approval for the Merger in refiling the HSR application.

13. From June 28 to July 26, 2023, Defendants allowed the market to believe that the only relevant variable to the consummation of the Merger was Chinese regulatory approval – and that MaxLinear was fully committed to the transaction.

14. But Defendants' scheme hid the relevant truth from investors, including Plaintiffs. Defendants have now admitted that on or before May 5, 2023, MaxLinear determined that Silicon Motion suffered an incurable material adverse event ("MAE") under the terms of the operative merger agreement ("Merger Agreement"), and also decided that Silicon Motion was in material breach of the Merger Agreement. Both of those events rendered the Merger Agreement a nullity as of that date—yet Defendants never disclosed these highly material facts to investors or Silicon Motion and instead affirmatively misrepresented MaxLinear's intent to complete the Merger. Defendants have asserted that they had the right to terminate

because merger conditions were "not satisfied or waived as of May 5, 2023," but said nothing of the sort at the time.

15. In truth, having gotten cold feet, Defendants' only hope was that the Chinese regulator would block the Merger and then Defendants could have litigated the breakup fee with Silicon Motion. The breakup fee of $160 million paled in comparison to the $4 billion price tag in cash and stock for the closing of the transaction. And, of course, if the regulator refused approval, MaxLinear would be in a better position still to pursue the other leg of its scheme: declaring an MAE and seeking to avoid any liability for backing out of the deal. MaxLinear would be in an even better position to avoid consequences if the second outside date (August 7) passed, as it would have multiple independent reasons for termination and might even be able to lay the blame entirely on Silicon Motion itself, as both Silicon Motion and MaxLinear had been responding to information requests from SAMR.

16. Although Defendants internally determined (or concocted) that an MAE had occurred and that Silicon Motion had committed other material breaches long before MaxLinear's public statements as to their intent to complete the Merger, they did not want to breach the Merger Agreement and terminate the Merger, as doing so would have subjected MaxLinear to litigation and the Merger Agreement's significant remedies, including specific performance—*i.e.*, being forced to go through with the deal that they no longer wanted—and uncapped damages. If, however, SAMR denied approval, or delayed its decision past the Merger Agreement's deadline, as Defendants hoped and expected, MaxLinear had an "easy out" and could not be forced to complete the transaction – even in a post-termination arbitration over the breakup fee.[1]

---

[1] In addition to the remedies described herein, the Merger Agreement contains a mandatory arbitration provision.

17. The choice facing MaxLinear was thus clear: it could tell the truth, which would give Silicon Motion a viable argument to force a $4 billion merger closing that MaxLinear did not want, and at bare minimum give Silicon Motion the best arguments for the $160 million termination fee in the worst case scenario for Silicon Motion, or MaxLinear could lie and pursue a scheme to leave Silicon Motion shareholders holding the bag while MaxLinear hoped that the Second Outside Date would come and go or SAMR would deny approval. In either case, the Defendants would completely take specific performance off the table and hand MaxLinear, not Silicon Motion, all the leverage in a termination fee battle.

18. MaxLinear's Investor Relations point person, Green, candidly admitted during an August 2023 interview that Defendants determined well before SAMR made its final decision that the Company would abandon the deal, after much "***thoughtful consideration***," "***data analysis***" and "***discussion***" that "***the board undertook over a period of time***."

19. The scheme unraveled on July 26, 2023. Before the market opened that day, SAMR approved the Merger, removing what investors, including Plaintiffs, thought was the last obstacle to consummation. Analysts reacted to SAMR's approval immediately, with multiple analysts stating they looked forward to understanding the merged company in the future.

20. Plaintiffs purchased tens of millions of dollars of Silicon Motion shares relying on MaxLinear's assurances, commitments, acts, and scheme. Investor confidence writ large was shown by Silicon Motion ADSs surging 82% from the prior day's close of $52.20 to an intraday high of $95.33, as market participants concluded that the transaction would be completed before the upcoming August 7, 2023 deal deadline. However, at 3:10 PM the *very same day*—not even ten hours after SAMR approved the Merger—MaxLinear stunned the market by reversing course and unilaterally terminating the Merger. MaxLinear did this by issuing a press release claiming that Silicon Motion had been in material breach of the Agreement as of May

5, 2023—conveniently, the prior outside date—and stating that "certain conditions in Article 6 of the Merger Agreement were not satisfied or waived ***as of May 5, 2023***," rendering the Merger Agreement was wholly ineffective as of that date.

21. MaxLinear's surprise announcement and termination of the Merger immediately caused the price of Silicon Motion's ADSs to collapse, falling from an intra-day high of $95.33 on July 26, 2023 to a close of just $65.35 per ADS—***a greater-than $30 collapse in one hour, on massive volume***. The next day, Silicon Motion's ADS price continued to crash, falling another $12.84 per ADS, on significant volume, to close at just $52.51 on July 27, 2023. MaxLinear's backing out of the deal thus caused a two-day drop of over ***44%***, or nearly ***$43 per ADS*** from the July 26 intra-day high.

22. Analysts immediately called out the blatant inconsistency of MaxLinear's abrupt termination of the deal with its repeated public statements assuaging investors that MaxLinear was fully committed to complete the Merger upon obtaining regulatory approval. For example, in a July 27, 2023 report, Wedbush analysts highlighted the highly suspicious "***timing of the announcement (post the resolution of a final roadblock preventing a deal), the lack of any prior apparent action by MXL to terminate the deal around May 5th (the first extended outside date), and in particular the two companies' application for HSR on June 28th (implying everything was still on track as of that date***)." FBN Securities ("FBN") issued a report on July 27 noting MaxLinear's deception, asking "***if the agreement was not in force as of [May 5], why did MXL continue to perform under the agreement by refiling HSR on [June 28] . . . or continue to describe the agreement in its releases and filings as still in force[?]***" The obvious answer, FBN explained, was that "***MXL recognized that its cleanest way out in . . . a deal it no longer wanted was SAMR***." When SAMR approved the Merger, MaxLinear had no choice but to immediately break the deal it did not intend to consummate in the first place, following what FBN described as a classic case of "***buyer's remorse***." Focus Capital

in a report issued months later, arrived at the same conclusion, *i.e.*, that MaxLinear had "***buyer's remorse***," and when SAMR failed to spike the deal, Defendants were left with no choice but to "***just take a Hail Mary and try and get out of this thing***."

23. As a result of Defendants' blatant misrepresentations and omissions, Plaintiffs suffered tens of millions of dollars in losses.

## II. JURISDICTION AND VENUE

24. Jurisdiction is conferred by §27 of the Exchange Act, 15 U.S.C. §78aa. The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act. This Court has jurisdiction over the state law claims asserted herein under 28 U.S.C. § 1367.

25. Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) because MaxLinear conducts business and resides in this District, and the events and omissions giving rise to the claims asserted herein occurred in substantial part in this District, including the dissemination of false and misleading statements in and from this District.

26. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III. PARTIES

### A. Plaintiff

27. Plaintiff HBK Master Fund L.P. is an investment fund organized under the laws of the Cayman Islands as a limited partnership. The fund is managed by HBK Investments L.P.

28. Plaintiff HBK Merger Strategies Master Fund L.P. is an investment fund organized under the laws of the Cayman Islands as a limited partnership. The fund is managed by HBK Investments L.P.

29. HBK Investments L.P. acted as the investment manager for the Plaintiffs during all times relevant hereto.

30. Plaintiffs purchased Silicon Motion ADSs during the relevant period and were damaged thereby.

**B. <u>Defendants</u>**

31. Defendant MaxLinear is a Delaware corporation with its principal executive offices located in Carlsbad, California. MaxLinear common stock is listed and publicly traded on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "MXL." MaxLinear is a provider of radio frequency ("RF"), analog, and mixed-signal integrated circuits – sometimes referred to as chips, microchips, or semiconductors – for the connected home, wired and wireless communications infrastructure, and industrial and multi-market applications.

32. Defendant Kishore Seendripu is a co-founder of MaxLinear and has served as its Chairman, President, and Chief Executive Officer since the Company's inception in 2003. Seendripu is also a member of MaxLinear's Board of Directors (the "Board"). Seendripu made, approved, or adopted false statements that caused or maintained artificial inflation in the price of Silicon Motion's ADSs, including statements at the Stifel Cross Sector Insight Conference in Boston, Massachusetts, held on June 6, 2023, and in a Form 8-K filed by MaxLinear on June 28, 2023 that he approved.

33. Defendant Steven Litchfield has served as Chief Financial Officer and Chief Corporate Strategy Officer of MaxLinear since July 2018. Litchfield made, approved, or adopted false statements that caused or maintained artificial inflation in the price of Silicon Motion's ADSs, including statements in a Form 8-K filed by MaxLinear on June 28, 2023 that he signed.

34. Defendants referenced above are referred to herein as the "Individual Defendants." The Individual Defendants and MaxLinear are referred to collectively herein as "Defendants."

35. During the relevant period, the Individual Defendants, as senior executive officers and/or directors of MaxLinear, were privy to confidential, proprietary and material adverse non-public information concerning MaxLinear, its operations, finances, financial condition, and present and future business prospects, including in relation to the proposed Merger with Silicon Motion, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof, and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being actively concealed from, the investing public. In addition, because of their high-ranking executive positions and control over MaxLinear, upon information and belief, the Individual Defendants were responsible for and/or participated in hatching and directing the scheme described herein.

36. The Individual Defendants are liable as they directly participated in the unlawful conduct described herein, including by making certain of the misstatements alleged in this Complaint and by devising and executing the scheme alleged herein. In addition, the Individual Defendants, as senior executive officers and/or directors of MaxLinear, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause MaxLinear to engage in the unlawful course of conduct alleged herein. By virtue of their positions of control, the Individual Defendants were empowered to and did control, directly or indirectly, the conduct of MaxLinear's business.

37. The Individual Defendants had the authority to, and did, control the contents of its reports, press releases, and presentations to securities analysts, which were disseminated to the investing public. The misrepresentations alleged herein were publicly disseminated, including to Silicon Motion investors, in a medium upon which a reasonable investor would have relied, and the misstatements were material when disseminated. The Individual Defendants were aware of, and/or provided with copies of, MaxLinear's reports and publicly disseminated false and misleading statements prior to or at the time of their issuance and could have prevented their issuance or caused them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

38. By virtue of their positions as senior executive officers and/or directors and as controlling persons of a company whose securities were, and are, registered with the SEC pursuant to the Exchange Act, and were traded publicly on the NASDAQ and governed by the federal securities laws, the Individual Defendants had a duty to disseminate promptly accurate and truthful information with respect to MaxLinear's plans and intentions regarding the Merger with Silicon Motion and to correct any previously issued statements that had become materially misleading or false. They also were prohibited from devising and executing a scheme to cause investors to purchase Silicon Motion securities at inflated prices in order to reduce the litigation risk attendant to MaxLinear's planned breach of the Merger Agreement. The Individual Defendants' misrepresentations and omissions relating to the Merger, as well as their execution of a scheme to harm Silicon Motion investors, violated these specific requirements and obligations.

### C. <u>Relevant Non-Party</u>

39. Silicon Motion is a relevant non-party to this Action. Silicon Motion is a Cayman Islands company headquartered in Zhubei, Taiwan. The company was founded in California in 1995, and currently operates in numerous countries, including Taiwan, the United States, Korea, China, Malaysia, and Singapore. Silicon

Motion's ADSs are listed and traded on the NASDAQ, with each ADS representing four ordinary shares of Silicon Motion common stock.

## IV. OVERVIEW OF THE FRAUD

### A. MaxLinear's Growth Strategy

40. MaxLinear sells communications microchips used in a range of applications including broadband, mobile and wireline infrastructure, data center, and multimarket. The Company's RF receiver products are utilized in varying kinds of electronic devices to enable the display of broadband video and data content.

41. MaxLinear was launched in 2003 by Defendant Seendripu and went public in 2010. Soon after going public, MaxLinear embarked on a strategy of growth through acquisitions. From 2015 to 2020, MaxLinear completed five acquisitions, ranging in size from approximately $21 million to $472 million. MaxLinear completed its most significant acquisition in 2020, acquiring Intel Corporation's Home Gateway Platform Division. This acquisition doubled MaxLinear's addressable market and was responsible for almost half of the Company's 2021 revenue of $890 million.

42. MaxLinear's acquisition strategy required integration planning, preparation, and execution expertise, and the Company has therefore long held itself out as adept at integrating acquired companies. MaxLinear repeatedly reaffirmed to investors that it continued to seek growth through acquisitions, including during the Company's Q1 2022 earnings call on April 27, 2022. In response to analyst questions on that call, Defendant Litchfield, MaxLinear's CFO, represented to investors that because MaxLinear was "generating a lot of cash" it would "continue to look at acquisitions." Defendant Seendripu further represented that, given the Company's "strong" and "accelerating" performance, "we got a lot of momentum [on] our ability to execute on acquisitions" and "this is going to be a story [that] continues."

### B. MaxLinear Announces the "Transformative" $3.8 Billion Silicon Motion Acquisition

43. On May 5, 2022, MaxLinear announced it had agreed to acquire Silicon Motion in a cash and stock deal valued at $3.8 billion. The Silicon Motion acquisition was to be, far and away, the largest acquisition to date for MaxLinear. The Merger consideration represented nearly a 50% premium to Silicon Motion's ADS price at the time it was announced, making its approval by Silicon Motion investors very likely. The Merger agreement called for consideration of $93.54 in cash and 0.388 shares of MaxLinear common stock for each Silicon Motion ADS, representing approximately $114.34 per ADS at the time. This represented a premium of approximately 48% above the $77.09 closing price for Silicon Motion's ADSs on the last trading day prior to public reports that it was exploring a sale.[2]

44. Similar to MaxLinear, Silicon Motion makes microchips, but its chips are generally used in different types of devices than MaxLinear's. Silicon Motion's chips are used mainly in consumer products such as personal computers, smartphones, flash memory cards, and flash drives used in expandable storage. The rationale for the Merger was thus that Silicon Motion's NAND flash controller technology and extensive customer relationships would be additive to MaxLinear's broadband, connectivity, and infrastructure business. MaxLinear emphasized that the deal would greatly expand its market and continue to fuel the Company's rapid growth, while also being immediately accretive to MaxLinear's bottom line.

45. Defendants repeatedly emphasized these expected benefits of the Merger to investors. In a press release announcing the deal, MaxLinear praised the Merger as providing the Company "transformative scale," noting it "roughly doubles MaxLinear's total addressable market opportunity to $15 billion" and stating the deal

---

[2] The Merger consideration also included $23.385 in cash and 0.097 shares of MaxLinear common stock for each Silicon Motion ordinary share not represented by an ADS, for total per ordinary share consideration of $28.59.

would be "immediately and materially accretive" to MaxLinear's operating income, operating margins, earnings per share, and cash flow. It was poised to catapult MaxLinear into a "top-ten fabless semiconductor supplier." During an investor call, Defendant Seendripu explained that the combined company was expected to "capture end-to-end platform functionality," especially in the critical enterprise data center market, and that the scale created by the Merger would allow for "increased capacity" via its manufacturing partners. Defendant Litchfield also emphasized to the market that the acquisition provided MaxLinear "an opportunity to really expand" MaxLinear's geographic reach, including in Asia.

### C. MaxLinear Gives the Market The Impression That The Only Condition To The Merger's Completion Was SAMR Regulatory Approval

46. The Merger could not be completed without regulatory approval by both U.S. and Chinese authorities. The Merger had to be approved by the Antitrust Division of the U.S. Department of Justice, and by the Federal Trade Commission under the HSR Act. The Merger also required approval from the Chinese antitrust regulator, SAMR. The Merger Agreement required that these approvals be obtained by no later than August 7, 2023.

47. There were no obstacles to financing the deal. MaxLinear successfully obtained committed financing for the cash portion of the deal through Wells Fargo, which, in combination with the combined companies' $277 million in cash on hand, was more than sufficient.

48. On August 31, 2022, Silicon Motion investors approved the Merger at an extraordinary general meeting. MaxLinear issued a press release following investor approval stating that "[t]he remaining requirements for closure of the transaction are customary closing conditions set forth in the Merger Agreement, including approval from the State Administration for Market Regulation (SAMR) of the People's Republic of China."

49. Investors were aware that the single greatest risk to the Merger was obtaining SAMR's authorization. In fact, the same day Silicon Motion investors approved the Merger, SAMR informed MaxLinear and Silicon Motion that it would not approve the deal under an expedited review but rather that the parties would have to submit a regular application for regulatory approval, which the parties ultimately did. In contrast, the U.S. regulatory review resulted in swift approval. MaxLinear publicly disclosed in its SEC filings that the Merger was authorized to proceed under U.S. law on June 27, 2022, following the expiration of the HSR Act's ordinary statutory waiting period.

50. As 2022 progressed, investors grew increasingly concerned about SAMR approval because of deteriorating China-United States trade relations. On October 7, 2022 the U.S. Government announced sweeping new limits on the sale of certain semiconductor technology to China. According to a New York Times article published that day, the trade restrictions were "aimed at crippling Beijing's access to critical technologies that are needed for everything from supercomputing to guiding weapons." Following the announcement, U.S. companies would need a special license to supply certain advanced computing chips, chip-making equipment, and other products to China.

51. Chinese regulators, including SAMR, retaliated against the new U.S. rules by slowing its merger reviews of several pending acquisitions by U.S. companies. In an April 4, 2023 article titled "China's New Tech Weapon: Dragging Its Feet on Global Merger Approvals," the Wall Street Journal identified MaxLinear's proposed acquisition of Silicon Motion as among the deals being slowed down by Beijing. Intel Corp.'s $5.2 billion takeover of Tower Semiconductor was another deal that had been slowed down in retaliation. In both cases, The Wall Street Journal reported, SAMR asked the companies involved to make products they sold in other countries available in China in an attempt to counter U.S. export controls on China. The article specifically highlighted the delay in the MaxLinear Merger as part of

China's "expanding toolbox of economic coercion," and described the delayed regulatory review as way to "pressure foreign companies, and by extension, their governments."

52. Analysts focused on the fact that Chinese regulatory approval was the "last step" remaining before the Merger could be completed. For example, Wedbush commented on November 1, 2022 that "the tension between US and China certainly creates uncertainty around SAMR approval." Wells Fargo also emphasized in a February 1, 2023 report that "the proposed acq[uisition] of SIMO remains a key focus area for investors," noting that the "***last step is China SAMR approval***." On February 2, 2023, Needham & Co. similarly warned that the "uncertainty around the SIMO acquisition remains the biggest overhang on the [MXL] stock," and explained that both MaxLinear's and Silicon Motion's "shares may be range bound" as "***the two parties wait in purgatory for a deal resolution***." On February 9, 2023, J.P. Morgan opined that "the prolonged process of approval in China could indicate that there may be potential accommodations and concessions required to secure approval for the deal." And, on March 16, 2023, Wells Fargo reiterated that uncertainty around the Merger was a "***key focus area***" for investors.

53. Analysts covering Silicon Motion and MaxLinear nearly uniformly focused on regulatory approval and not MaxLinear's unilateral desire to terminate the merger as a risk – as analysts (and the market) were left in the dark that MaxLinear had developed cold feet prior to SAMR's approval.

### D. The Merger Agreement Does Not Allow MaxLinear To Simply Back Out Of The Deal

54. The Merger Agreement did not allow MaxLinear to simply back out of the deal ahead of SAMR's decision because of, for example, a change in business strategy or declining market for the companies' products. Pursuant to the Merger Agreement, a party could only terminate in narrow, prescribed circumstances, and had to follow required specific processes to do so, ***including providing prompt notice***

***of any claimed material breaches or MAEs***. If MaxLinear did not terminate consistent with the Agreement's terms, it would be forced to close the deal with SIMO under the Merger Agreement except under very narrow circumstances.

55. *First*, if the Merger did not obtain necessary regulatory approvals, either because of a regulatory denial or because the approvals were delayed beyond the closing deadline, MaxLinear would have an easy out and could not be forced to complete the deal. If this occurred, MaxLinear's liabilities would not exceed the $160 million breakup fee, and MaxLinear could litigate paying even that fee with whatever leverage MaxLinear had available to it. If MaxLinear could prove, for instance, that Silicon Motion was "in material breach of any representation, warranty [or] covenant" of the Agreement and the breach was the "primary cause" preventing any condition to closing, it could avoid the fee altogether.

56. The "Original Outside Date" for closing in the Merger Agreement was February 6, 2023, but, assuming neither party was in breach and all that remained pending was the necessary regulatory approvals, the date would be automatically extended twice to the "First Extended Outside Date" of May 5, 2023, and then to the "Second Extended Outside Date" of August 7, 2023. If regulatory approval was still not received by August 7, 2023, or if a denial was received by that time, MaxLinear had the right to terminate the deal, potentially subject to the breakup fee.

57. *Second*, the Merger Agreement allowed MaxLinear to terminate the Merger if Silicon Motion was in breach of its "representations, warranties or covenants" in the Agreement. Before invoking this provision, however, MaxLinear was required to deliver "written notice of such breach" and provide Silicon Motion the ability to cure the specified breach within thirty days, or by the next applicable Outside Date, whichever occurred first.

58. The Merger Agreement also provided that MaxLinear could validly terminate the deal if an unexpected development had a "Material Adverse Effect," or an "MAE," on Silicon Motion's "business, financial condition, assets, liabilities or

results of operations." The Merger Agreement required, however, that MaxLinear give Silicon Motion "prompt notice" of the MAE if it was expected to prevent or delay closing. Importantly, however, both the Merger Agreement and Delaware law (which governed the determination of an MAE) significantly limited the conditions that could constitute an MAE and warrant termination. The Merger Agreement expressly excluded mere business or economic deterioration from its definition of an MAE, which could therefore could never be a valid basis for termination. The Merger Agreement expressly excluded from its definition of an MAE: (a) changes in economic or regulatory conditions, including changes in interest rates or customer demand for MaxLinear or Silicon Motion's products, (b) changes in "global or national political conditions," (c) changes in the trading price for Silicon Motion's ADSs, and (d) "any failure by [Silicon Motion] . . . to meet any revenue, earnings or other financial projections or forecasts."

59. Accordingly, the Merger Agreement did not allow for MaxLinear to back out of the deal if the Merger no longer made economic sense or simply became a poor deal for MaxLinear. If MaxLinear backed out of the deal to escape adverse business or financial consequences, doing so would amount to a "Willful and Material Breach" under the terms of the Merger Agreement, and would subject MaxLinear to severe express remedies including specific performance—meaning MaxLinear would be forced to proceed with the Merger—as well as uncapped money damages.

60. On May 3, 2023—just two days before the date by which MaxLinear would later claim that Silicon Motion was in material breach of the Merger Agreement—MaxLinear discussed the Merger in an interview with analysts. During that interview, an Alliance Global Partners Merger Arbitrage Group analyst asked about the Merger's progress generally and, specifically, about SAMR approval. In response, MaxLinear's Investor Relations point person, Leslie Green, assured the analyst and, by extension, investors, that the Merger was progressing satisfactorily

and the prospects for regulatory approval within the anticipated mid-2023 timeframe were good, stating: "we continue to actively work to get the deal closed by mid-year, which was always the time frame that we expected." When the analyst followed up to ask whether MaxLinear "remain[ed] committed to acquiring [Silicon Motion]" and whether "[n]othing's changed there," Green, on behalf of the Company, unequivocally confirmed that MaxLinear remained committed to completing the Merger once SAMR approved the deal, stating: "No, nothing's changed there."

61. SAMR did not approve the Merger by the First Extended Outside Date, May 5, 2023. Accordingly, investor focus on the Merger intensified as the market questioned whether the deal would close prior to the now-final August 7, 2023 deadline, the "Second Extended Outside Date."

### E. Defendants Falsely Assure Investors They Will Complete The Merger If Regulatory Approval Is Received Even Though Defendants Had Already Decided To Abandon The Deal

62. By May 5, 2023, MaxLinear had purportedly already made the determination (or simply concocted) that Silicon Motion was in breach of the Merger Agreement. In the Company's own words, released hours after SAMR approved the deal, "certain conditions in Article 6 of the Merger Agreement were not satisfied or waived ***as of May 5, 2023***," and therefore the First Outside Date was "***not automatically extended***" to August 7, 2023, which, MaxLinear asserted, rendered the Merger Agreement null and void. The requirements of Article 6 were broad and included (i) Silicon Motion's representations and warranties; (ii) that Silicon Motion "performed and complied" with all its obligations under the Merger Agreement; and (iii) the absence of an MAE. Thus, according to MaxLinear's own statement, Silicon Motion had breached Article 6 of the Merger Agreement by no later than May 5, 2023. Defendants did not disclose their view that Silicon Motion was in breach, nor did MaxLinear provide notice and an opportunity to cure to Silicon Motion, nor did they disclose to the investing public their cold-feet abandonment of the merger.

Instead, and despite the fact that they did not intend to cause MaxLinear to complete the Merger, they continued to falsely affirm publicly that MaxLinear was fully committed to the Merger and was taking all necessary steps to close the Merger by the August 7, 2023 deadline.

63. On June 2, 2023, Roth MKM hosted a webinar with Defendant and MaxLinear CFO Steven Litchfield, as well as Green. An analyst from HBK attended the webinar. The Silicon Motion transaction was, unsurprisingly, a topic of the webinar. MaxLinear's representatives responded to several questions on the pending transaction, including about its rationale, the cash/equity mix, and macro impacts.

64. The MaxLinear representatives were directly asked whether there was conviction in the Silicon Motion deal despite the cyclical downturn in technology and semiconductors. They responded that MaxLinear remained very interested in Silicon Motion. Asked about the impact of interest rate increases, they responded that there were no issues with the deal and funding was committed. And in concluding remarks, MaxLinear representatives asserted that MaxLinear was excited about the acquisition and that the rationale for the deal was stronger than ever.

65. In response to a question about the regulatory process, and in particular what remediation options MaxLinear would consider, MaxLinear representatives responded that the process was straightforward and that SAMR's regulatory approval was the last item needed for deal closing.

66. During this long and comprehensive question and answer session, spanning multiple questions about the Silicon Motion transaction, MaxLinear's representatives never mentioned, or even suggested, that a Material Adverse Event had already occurred or that MaxLinear would terminate the transaction upon the receipt of Chinese regulatory approval.

67. Roth analyst Suji Desilva reported in an analyst report following the webinar that MaxLinear management was still committed to seeing the Silicon Motion deal go through. That analyst report was picked up by business press who

also reported, based on the analyst report and management's comments at the webinar, that Chinese approval was the "last hurdle for completion."

68. Defendants told a similar story days later. Defendant Seendripu, and Green, the Company's Investor Relations representative, participated in the Stifel Cross Sector Insight Conference in Boston, Massachusetts on June 6, 2023. The Stifel Conference is billed as Stifel's "signature event" of the year and 2023's conference was an in-person event attended by more than 300 companies and 1,600 investors, with additional participants attending virtually. According to Stifel, the Stifel Conference's goal was "to provide institutional investors with high-level access to senior management" of the companies that were participating, including MaxLinear. The 2023 Stifel Conference was attended by company representatives, institutional investors, and private equity/venture capital investors from a variety of sectors, including business services, consumer and retail services, internet, materials, media, and technology. Prior to the conference, MaxLinear issued a press release publicizing its participation at the conference and providing a link for interested investors to view the presentation via a webcast.

69. The Stifel Conference included a "fireside chat" between Seendripu and Stifel's Managing Director of the Technology Group, Tore Svanberg. During the chat, Svanberg noted that the Silicon Motion Merger was "one of the topics investors want to hear most about" and that he planned specifically to address the Merger during their discussion. Following a discussion about MaxLinear's business segments, Svanberg returned to the topic of the Merger and asked Seendripu for an "update" on the Merger, inquiring as follows:

> Okay. And the – and the last topic of course, is SIMO, I know there's a limitation to what you can say, but at least give us an update on the asset strategically, you talked obviously about storage and data center, right? So I still believe this is an asset that you're very interested in acquiring?

///

70. Defendants had already determined they did not intend for MaxLinear to complete the Merger, but Seendripu could not admit this, as doing so would have subjected MaxLinear to the severe remedies provided for in the Merger Agreement. Rather than revealing the truth, Seendripu gave a lengthy and detailed answer about the Merger and its many expected benefits. He punctuated his response by falsely representing to investors that Silicon Motion remained a "***very strategic asset***" for MaxLinear and that management remained "***very, very bullish***" on combining the companies:

> Look, we have some conviction [in] what we do. And I don't think we touch anything where our core technology platform doesn't expand us into the adjacent markets, right? And storage is not an adjacent market. Our primary focus [has been] the enterprise market and the data center market, and Silicon Motion is the number one merchant [] controller – storage controller supply in the world. And, I don't look at controllers at storage. I look at [it] as data traffic. I look at [it] as how do you improve latency and speed of access and the amount of the memory[.] [T]oday, non-memory is monstrous, right? [] But the most important thing about the memory is if you look at the storage network is that, speed of access of the data and integrity of the data and throughput. And now it's the excel. It's going to spread all over the place as well. So you need to tightly couple the controllers with accelerators, right? And they all belong together, ***and together, [with Silicon Motion] we bring the portfolio to make it happen.***
>
> The other part of it is that memory is no longer about moving bits around with [the] controller, right? Talked about data integrity. So it's a lot of encryption technologies, signal processing, I/O bandwidths, the mixed-signal IP [is] all common. ***So we'll get the, what they call, the technology synergy. And therefore, the R&D synergy [w]e need to, for both the companies combined together.***
>
> So we should be able to have synergies in the OpEx. ***We still are very, very, what I call, bullish that we can acquire the synergies that we told you all about. And yes, the revenues of the combined companies have come down [], but it just delays*** the, what I call, the benefits of the acquisition accordingly by a year or so. ***But the basic rationale has not changed at all. So I believe it's a very strategic asset for the company***.

71. In recognition of the obvious materiality of Seendripu's statements reaffirming MaxLinear's commitment to closing the Merger, the next day, June 7, 2023, MaxLinear *filed* (not furnished) with the SEC on Form 425 a transcript excerpt of the Stifel Conference conversation that contained only the above question and

answer. The filing was made "pursuant to Rule 425," or 17 C.F.R. §230.425 ("Rule 425"), which, according to the SEC, was "designed to reduce selective disclosure" of material information relating to a transaction "by permitting widespread dissemination of information . . . ***to inform all security holders about the terms, benefits and risks of a planned extraordinary transaction***," thereby enabling "a more well informed and efficient market." Notably, the SEC requires that only transcripts that are used to communicate information about a pending merger must be filed with the SEC, while "routine business communications that refer to the transaction in a non-substantive way" need not be publicly filed. Accordingly, MaxLinear's Rule 425 filing of the transcript makes clear that Defendant were aware that Seendripu's statements about the Merger in the filing were material to investors, and the statements were conveyed in a medium upon which reasonable investors would rely.

72. Public statements alone, however, were insufficient to carry out Defendants' scheme. The scheme required that Defendants take action as well. Had MaxLinear, for example, stopped cooperating with SAMR entirely, this would have both gotten back to investors like plaintiffs (who would rightly interpret it as a repudiation of Defendants' prior statements and an indication that MaxLinear got cold feet) but also would have given Silicon Motion clear grounds for a future arbitration with potential remedies of specific performance and uncapped damages. In order to avoid such arbitration risk, MaxLinear needed to continue to act like it was ready to close the Merger.

73. Thus, in June 2023, per press reports, MaxLinear continued to engage with SAMR to keep the ruse going. As CMCInsight reported on June 21, 2023, "MaxLinear is still making efforts to address certain third-party concerns regarding [the SIMO acquisition] . . . Such efforts include submitting commitments to address supply-related concerns." MaxLinear's submission of such commitments to SAMR was just another step in the scheme, as MaxLinear had already either determined or

concocted an MAE as of May 5, 2023, and had determined to terminate the Merger before going through the motions with SAMR.

74. Just days later, on June 28, 2023, MaxLinear took yet another step in the scheme, re-filing (together with Silicon Motion) for clearance under the HSR Act. The re-filing (in compliance with the terms of the Merger Agreement), implied to the market that MaxLinear was going through with the Merger, and that MaxLinear had not identified an MAE or other purported breach that would make such a filing pointless. But the filing itself was simply another act in the scheme, meant to continue the ruse already in place, convincing Silicon Motion (and investors) that the Merger was going forward while MaxLinear attempted to improve its position by (a) avoiding the threat of specific performance, and (b) attempting to place itself in the most advantageous position to avoid the breakup fee.

75. MaxLinear also represented in a Form 8-K filed with the SEC that it was continuing to secure regulatory approval for the Merger:

> The completion of the Merger is conditioned upon, among other things, the expiration or termination of the waiting period applicable to the consummation of the Merger under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act" and, such waiting period, the "HSR Waiting Period"). MaxLinear and Silicon Motion previously filed under the HSR Act, and the HSR Waiting Period expired at 11:59 p.m. ET on June 27, 2022. However, since the Merger was not consummated by June 27, 2023, clearance under the HSR Act has expired, and ***on June 28, 2023, MaxLinear and Silicon Motion re-filed under the HSR Act.***

76. Defendants' misstatements and acts in furtherance of the scheme had their intended effect. The market was falsely assured that MaxLinear remained committed to consummating the Merger and that the deal would close as soon as SAMR signed off on the deal. Contemporaneous analyst reports confirm this false impression among market participants. On July 24, 2023, Roth MKM issued a report on MaxLinear it referred to as an "Acquisition Update." The report stated "MXL is approaching the early-August outside date for its planned SIMO acquisition while simultaneously working toward securing Chinese regulatory approval for the deal."

Notably absent from this and other analysts' reports was any inkling that MaxLinear intended to terminate the deal.

### F. Prior to June 28, 2023, MaxLinear Determines to Abandon The Merger

77. Defendants had successfully hidden from the market that, prior to SAMR approval, Defendants had internally determined to abandon the Merger because the deal was no longer economically attractive to MaxLinear. While Defendants were going through the motions of complying with the requirements of the Merger Agreement and falsely affirming their intent to close the deal, they were secretly hoping to be bailed out by SAMR disallowing the Merger.

78. In the months following the Merger's announcement, MaxLinear's business had deteriorated.

79. According to former employees of MaxLinear quoted in the Class Action Complaint, four months after entering into the Merger Agreement, in September 2022, MaxLinear's Intel division, which accounted for half of MaxLinear's revenue, was internally reporting to management that it expected a 40% drop in revenue for 2023. Specifically, according to a former Director of Product Marketing at MaxLinear identified as FE 2,[3] as described in the Class Action Complaint, the Intel division grew explosively in 2022 while customers ordered more microchips than they needed in order to avoid complications from disrupted supply chains. The result was that these customers were left with an excess of supply in 2023. This included MaxLinear's largest customer, Comcast Corporation. The problem was recognized in the Intel division soon after the Merger was announced when it asked its customers, in August 2022, to forecast their needs for the upcoming year. According to the Class Action complaint, the division's large customers slashed

[3] Plaintiffs have determined the identity of FE2, confirmed that FE2 worked at MaxLinear during the time referenced in the Class Action Complaint and independently verified FE2's employment with MaxLinear in the role cited via interviews with other former employees of MaxLinear.

their expected orders, resulting in an expected 40% drop in 2023 revenue. According to the Class Action complaint, FE 2 personally was involved in the preparation of a presentation discussing the poor 2023 outlook, which the head of the Intel division, Doron Tal, presented to MaxLinear executive management, including Seendripu and Litchfield, in September 2022.

80. The Class Action complaint also identifies an FE 1, who was MaxLinear's Director of Global Trade Compliance[4] from November 2022 to July 2023. According to the Class Action complaint, FE 1 explained that, due to declining financial results and the drop in expected future demand, MaxLinear began significant layoffs in January 2023. FE 1 referred to these as "quiet" layoffs and said they occurred at different MaxLinear locations worldwide.

81. The reduced forecasts came to fruition in 2023. On April 26, 2023, MaxLinear publicly disclosed that its Q1 2023 revenue was down "15% sequentially," and guided to only $175 million to $205 million in Q2 2023 revenue, which was well below consensus. Deutsche Bank analysts noted in an April 26, 2023 report that this was MaxLinear's "second consecutive quarter" providing a "significantly weaker guide as a combination of weaker demand and significant channel/customer inventory digestion lead to a ~23% [quarter over quarter] drop in revenue." Wells Fargo also noted MaxLinear's "much weaker-than-expected guide." MaxLinear's internal forecasting and customer orders made clear to Defendants that MaxLinear's troubles would continue at least through 2023.

82. Due to its poor financial performance and reduced guidance, MaxLinear's stock price fell by more than half, from over $50 per share just prior to the announcement of the Merger in May 2022, to $23.39 by May 4, 2023.

---

[4] Plaintiffs have determined the identity of FE 1, confirmed that FE 1 worked at MaxLinear during the time referenced in the Class Action Complaint and independently verified FE 1's employment with MaxLinear in the role cited via interviews with other former employees of MaxLinear.

83. Adding to MaxLinear's headwinds, interest rates rose substantially through the second half of 2022 and the first half of 2023, dramatically increasing the cost to finance the cash portion of the transaction. When the Merger was initially announced on May 5, 2022, Defendant Litchfield disclosed that MaxLinear was expecting to finance the deal at the Secured Overnight Financing Rate ("SOFR Rate") "plus 2.5% to 3.5%." When he made that statement, the SOFR Rate was 0.79%, but by May 5, 2023, the SOFR Rate had skyrocketed to 5.06%. Because of the significant run-up in rates, MaxLinear would have had to pay between 7.5% and 8.5% on the debt needed to close the Merger, at least double what it expected to pay (between 3.29% and 4.29%) when it agreed to the Merger.

84. Given the amount MaxLinear needed to finance to close the deal, $3.25 billion, the significant increase in rates would have more than doubled MaxLinear's annual financing costs from approximately $110 million to approximately $250 million. Thus, MaxLinear's ***annual*** increase in financing costs was nearly as much as the entire $160 million breakup fee, which it would only have to pay a single time (if indeed it had to pay the full amount) if it pulled off its scheme of feigning its intention to close the deal while hoping to be bailed out by SAMR denial.

85. Also, MaxLinear's market capitalization had fallen from approximately $3.4 billion prior to the Merger's announcement to only $1.9 billion by May 2023. This drop in market capitalization would have left MaxLinear significantly more leveraged if it completed the deal, constraining its options moving forward.

86. Because of MaxLinear's decreased financial outlook, and the increase in financing expense caused by the rise in interest rates (neither being a factor that would allow MaxLinear to back out of the Merger Agreement), Defendants were eager for a way out of the deal. As such, Defendants hatched their scheme to make it appear as though they intended to close the Merger while hoping SAMR would kill the deal. Thus, MaxLinear concocted that Silicon Motion suffered an incurable MAE and committed other purported breaches of the Merger Agreement as of May 5, 2023.

This plan was in place and was being undertaken as early as May 5, 2023, the date by which MaxLinear purported to claim Silicon Motion was in breach. But MaxLinear could not simply back out of the deal at that time and risk arbitration that could result in specific performance. To avoid that situation, Defendants engaged in a scheme that left Silicon Motion shareholders holding the bag.

### G. The Truth Is Revealed: Just Hours After SAMR's Approval, MaxLinear Backs Out Of The Deal And Causes Silicon Motion ADSs To Lose Nearly Half Their Value

87. On July 26, 2023, before market open, SAMR granted regulatory approval for the Merger and publicly announced its decision on the agency's website. This removed the final hurdle in the way of closing the Merger. Because Defendants had repeatedly assured the market that MaxLinear fully intended to complete the acquisition of Silicon Motion following SAMR approval, the price of Silicon Motion ADSs surged by over 82%, from the prior day's close of $52.20 per ADS to an intraday high of $95.33 on July 26, 2023—an increase of $43.13 per ADS.

88. Plaintiffs purchased tens of millions of dollars of SIMO ADSs during this period in reliance upon Defendants' assurances.

89. Following SAMR's decision, the market understandably expected the Merger to close by the August 7, 2023 Outside Date. Wedbush analysts immediately issued a "Quick Note" on the morning of July 26, 2023, stating that the approval "would seem to clear the way for the deal to be consummated ahead of the August deal expiration date" and noting "we now believe the transaction is on track to be completed." Wells Fargo analysts similarly stated that morning that the approval "pav[ed] the way for a final close ahead of the Aug[.] 7 merger agreement exp[iration]."

90. Analysts at ROTH MKM said SAMR approval was a "Major Step Toward Completing Acquisition" and that "we believe MXL can leverage its larger corporate and customer footprint to drive broader adoption of SIMO's enterprise

storage products in particular." They went on to state "MXL's acquisition of SIMO is consistent with past MXL acquisitions" – clearly treating the acquisition as a done deal now that SAMR approval was given.

91. Analysts at B. Riley, reaffirming a price target of $107 a share (the merger value), discussed regulatory approval as a "positive" for SIMO stock, and looked forward to "ultimate close timing" as the next step. Like other analysts, B. Riley did not suggest a word of speculation that MaxLinear would terminate.

92. While SAMR approval deprived MaxLinear of its easy out, Defendants' scheme was not finished. Waiting for the Second Outside Date was no longer an option. So Defendants quickly pivoted to the next option in their scheme: at 3:10 PM on July 26, 2023, ***just ten hours after SAMR approved the Merger***, MaxLinear made the stunning announcement that it was unilaterally terminating the Merger. Without providing any specifics, MaxLinear's press release, which was also filed on Form 8-K with the SEC, claimed that MaxLinear was terminating the Merger Agreement because: (i) Silicon Motion had not satisfied unspecified "conditions" of the Merger; (ii) Silicon Motion had suffered an unspecified MAE; and (iii) Silicon Motion had made unspecified "breaches" of the Merger Agreement. Incredibly, MaxLinear claimed these events had occurred "***as of May 5, 2023***," despite the fact that MaxLinear reaffirmed its commitment to the Merger repeatedly after that date.

93. MaxLinear's July 26, 2023 press release, issued less than one hour before the end of the trading day, stated:

> ***Following [the] regulatory approval***, on July 26, 2023, MaxLinear provided notice to Silicon Motion that it has terminated the Merger Agreement and MaxLinear is relieved of its obligation to close because, among other reasons, (i) certain conditions to closing set forth in the Merger Agreement are not satisfied and are incapable of being satisfied, (ii) Silicon Motion has suffered a Material Adverse Effect that is continuing, (iii) Silicon Motion is in material breach of representations, warranties, covenants, and agreements in the Merger Agreement that give rise to the right of the Company to terminate, and (iv) in any event, the First Extended Outside Date has passed and was not automatically extended because certain conditions in Article 6 of the Merger Agreement were ***not satisfied or waived as of May 5, 2023.***

94. The release contained no further detail. Nonetheless, MaxLinear claimed that it was entitled to avoid paying Silicon Motion even the $160 million breakup fee.

95. On a conference call following the market's close on July 26, 2023, Defendants refused to provide any details or respond to any analyst questions about their sudden and surprising termination of the Merger. Instead, Defendant Litchfield, continuing to hide Defendants' scheme, simply stated: "As you saw from our press release, we have exercised our contractual right to terminate the merger agreement. Please note that we do not intend to share any further detail on this matter at this time, and our call today will be focused on our quarterly results."

96. Before the market opened on July 27, 2023, Silicon Motion blasted MaxLinear in a press release, refuting any legitimate basis for MaxLinear's termination of the Merger Agreement, and also noting that MaxLinear had never once raised any purported issues with the deal during the 15 months since the Merger Agreement was signed. The press release stated:

> ***In the 15 months since the signing of the merger agreement between the parties, Silicon Motion worked cooperatively with MaxLinear to obtain regulatory approvals for the merger, Silicon Motion complied with its obligations under the agreement and Silicon Motion has not suffered a material adverse effect*** … Silicon Motion ***expects MaxLinear to abide by its obligation under the merger agreement*** and intends to vigorously enforce its rights under the merger agreement.

97. The market was nothing short of shocked by MaxLinear's unilateral termination, and analysts excoriated Defendants for misleadingly feigning commitment to the deal, and misleading investors, after May 5, 2023. For example, FBN Securities, an institutional brokerage firm, issued a report on July 27 highlighting that MaxLinear's "termination falling so closely on the heels of the SAMR approval suggests ***buyer's remorse***" as the reason for backing out of the deal. FBN's report further took aim at Defendants' prior public expressions of commitment to the Merger, querying that "if the agreement was not in force as of [May 5], why

did MXL continue to perform under the agreement by refiling HSR on [June 28] ... or continue to describe the agreement in its releases and filings as still in force[?]" FBN then provided the answer: "***MXL recognized that its cleanest way out in … a deal it no longer wanted was SAMR***."

98. Similarly, a July 27, 2023 Wedbush report observed that "the timing of the announcement (post the resolution of a final roadblock preventing a deal), the lack of any prior apparent action by MXL to terminate the deal around May 5th (the first extended outside date), and in particular the two companies' application for HSR [approval] on June 28th (implying everything was still on track as of that date) all suggest" that something else was at play for MaxLinear. Wedbush later noted on July 28, 2023 that "SIMO had no indication MXL intended to terminate the agreement," further indicating that MaxLinear was not telling the entire truth. J.P. Morgan analysts similarly commented on the suspicious timing of the termination in a July 28, 2023 report, noting that MaxLinear terminated the deal "alleging Material Adverse Effect, right after China SAMR approved the acquisition."

99. As a direct result of MaxLinear's announcement that it was terminating the Merger Agreement, the price of Silicon Motion ADSs collapsed from a market high of $95.33 per ADS on July 26, 2023, to close at just $65.35 per ADS on July 26, 2023, a decline of 31%, or over $29.50 per ADS, in less than one hour, with an unprecedented trading volume of 17,771,620 ADSs. The price of Silicon Motion ADSs continued their freefall when the market opened the next day, dropping an additional $12.84 to close at just $52.51 per ADS on July 27, 2023, with a heavy trading volume of 9,116,569 ADSs, representing a two-day decline of over 44%, or nearly $43 per ADS from the July 26 intra-day high.

100. Analysts and market commentators continued to report on MaxLinear's deception following the collapse of Silicon Motion's ADS price. For example, in an August 14, 2023 podcast published on SeekingAlpha, Focus Capital explained how SAMR's approval came in the midst of a severe "downturn" in both MaxLinear's

business and the semiconductor industry, "and that, combined with the huge rise in interest rates," unquestionably led MaxLinear to suffer "buyers' remorse." Focus Capital agreed that, left with no other option, MaxLinear internally concluded "can we even afford it?"—"Let's just take a Hail Mary and try and get out of this thing."

### H. Subsequent Developments Further Confirm The Fraud

101. MaxLinear has admitted that Defendants had determined (or concocted) an MAE and a material breach of the Merger Agreement long before the July 26, 2023 termination. MaxLinear's head of Investor Relations, Leslie Green, participated in an August 1, 2023 analyst call during which she was repeatedly asked pointed questions by an analyst about MaxLinear's justification for terminating the Merger. Green refused to answer the vast majority of questions, but she was ultimately forced to admit MaxLinear decided it would terminate the Merger "a period of time" before the announcement was made, explaining the decision involved "a lot of thoughtful consideration" and was thoroughly "discuss[ed]" by MaxLinear's Board prior to SAMR's approval. She further explained "[t]he decision to go [down] that path is the decision that the board undertook ***over a period of time*** with a lot of thoughtful consideration, and data analysis and consulting that went into that decision. ***It's not a spur of the moment thing***." Green repeated this explanation, stating the termination "was a ***well-considered decision*** that did ***not spontaneously occur, but it occurred over a period of time*** that took a lot of thought, analysis, and discussion that went into it."

102. Silicon Motion issued an August 7, 2023 press release stating it "categorically rejected MaxLinear's purported termination of the Merger Agreement, and the assertions made by MaxLinear, in its letter of July 26, 2023." Silicon Motion annexed a letter to its press release asserting once again that MaxLinear had never provided notice of the purported grounds for termination, as required by the Merger Agreement, "in the nearly fifteen months since the parties signed the Agreement."

103. MaxLinear would not be deterred from its scheme. It failed to close the Merger by the August 7, 2023 Outside Date, and, as a result, Silicon Motion issued an August 16, 2023 press release stating it was treating the Merger Agreement as terminated in light of the passage of the Outside Date and that it would pursue substantial damages "well in excess" of the termination fee. According to the press release, Silicon Motion intended to commence an arbitration in the Singapore International Arbitration Centre ("SIAC") against MaxLinear.

104. On September 21, 2023, Silicon Motion issued yet another press release confirming for the third time that MaxLinear never provided Silicon Motion with the contractually required notice or an opportunity to cure, stating: "In the 15 months following the signing of the Merger Agreement, MaxLinear never once asserted, prior to sending its July 26, 2023 notice of termination, that there had been a material breach of the Merger Agreement, nor did it or its representatives ever mention an MAE or a breach of the ordinary course covenant." The third release also revealed that, prior to the termination, Silicon Motion provided Defendants with an advance copy of Silicon Motion's second quarter 2023 results, and MaxLinear "again, did not state that the results gave rise to an MAE."

105. On October 5, 2023, Silicon Motion announced that it had commenced arbitration against MaxLinear for its breach of the Merger Agreement. The press release containing the announcement noted Silicon Motion had filed a claim in the SIAC seeking "payment of the termination fee of $160 million, further substantial damages, interest and costs."

### I. <u>Publicly Available Accounts Of Former MaxLinear Employees Confirm Defendants Had No Intention Of Closing The Merger</u>

106. According to the Class Action Complaint, former employees of MaxLinear state that ***even as late as mid-July 2023***, Defendants had not taken the most basic and rudimentary steps to prepare for an integration of the two companies.

107. According to the Class Action Complaint, FE 1, the Company's former Director of Global Trade Compliance, underscored that comprehensive merger and integration planning was vital if MaxLinear was intent on completing the Merger, but that no such efforts were undertaken at the Company even as late as July 18, 2023, mere days before the Merger was terminated. For example, FE 1, an employee with more than 25 years experience in global trade, logistics, regulatory compliance, and direct involvement in mergers and acquisitions ("M&A") transactions, explained that over 40% of Silicon Motion's contracts were in Chinese and MaxLinear could not review them; that Silicon Motion's personnel capable of translating the contracts were made available to MaxLinear during a transition period; and that MaxLinear not only declined this offer of assistance, but the Company laid off its top compliance officer (FE 1) mere weeks ahead of the August 7, 2023 closing deadline. As FE 1 explained, the lack of merger and integration planning was endemic across the Company, including in the critical areas of Human Resources ("HR"), Marketing, and Logistics/Supply Chain. This lack of merger and integration planning across the Company in the critical period of May through July 2023 (with the deadline being August 7, 2023) indicated to FE 1 that MaxLinear did not have genuine interest in closing the deal.

108. According to the Class Action Complaint, FE 1 reported directly to MaxLinear's General Counsel, Michelle Sayer, and to Associate General Counsel, Rohan Virginkar.[5] The three of them had a December 7, 2022 call with Silicon Motion's compliance professionals to assess Silicon Motion's compliance efforts and review their compliance tools and systems. FE 1 explained that, following the meeting, she raised with Virginkar and Sayer that MaxLinear should have an "integration schedule" of all Merger activities that (i) identified the milestones and

---

[5] FE 1 reported to General Counsel Sayer starting in November of 2022, and to Associate General Counsel Virginkar starting in February of 2023.

the key functional leaders to properly integrate Silicon Motion's compliance department, and (ii) identified a pre- and post-Merger timeline for the transition efforts. In addition, according to FE 1, "several key questions should have been identified, at minimum, the types of contracts, export compliance concerns—including, but not limited to, export classifications, Denied Parties screening and electronic systems and tools—what systems MaxLinear would use post-Merger, and whether MaxLinear would export all of Silicon Motion's transactions into MaxLinear's current tracking system or vice versa." Upon learning during the initial meeting that as much as 40% of Silicon Motion's contracts were in Chinese, FE 1 strongly felt that MaxLinear needed a plan for reviewing the Chinese-language contracts and assuring they complied with relevant foreign laws. FE 1 confirmed that industry practice is to have such an integration schedule at least 6 months before closing a merger.

109. According to the Class Action Complaint, FE 1 stated that she inquired of Virginkar every six weeks, from December 2022 until she left the Company in mid-July 2023, when she would be receiving an integration plan for the upcoming Merger, but she never received one. In FE 1's own words: "there was no definitive action plan or timeline" for the expected integration, which "was very bothersome to me" given her repeated requests of the Company's senior management to prepare such a plan and timeline.

110. According to the Class Action Complaint, FE 1 explained that MaxLinear's failure to take the most basic steps toward pre-merger integration planning was unique and singular in her long professional experience working directly on mergers and acquisitions and the integration planning that is required for such transactions. In her past M&A experiences in the aerospace defense industry, an integration action plan and timeline was a crucial part of the process of successful integration. Such plans and timelines would detail the parties responsible for the integration-related tasks, which integration milestones were critical, and would set

forth the necessary timeframe for accomplishing the identified tasks, with each milestone triggering others. As FE 1 explained, "My expectations were based on my experience in mergers and acquisitions. We always had a list of tasks company-wide in terms of what the finance people needed to do to secure the loan, and logistics. Every single function of the company has their milestones." Project managers would be assigned spreadsheets to track progress against milestones, and regular team meetings would address milestone developments, with all of the managers reporting on their progress to confirm that everyone was staying on track. FE 1 noted that "at MaxLinear, I did not see any of this" as late as mid-July 2023 (when she was laid off), despite her constant inquiries. As FE 1 reiterated, "There was no plan and no action team in place."

111. According to the Class Action Complaint, FE 1 stated that management continuously silenced the concerns she repeatedly expressed to the General Counsel and Associate General Counsel. For example, after learning in February 2023 that certain Silicon Motion compliance personnel would be made available to MaxLinear in the United States, FE 1 raised the possibility of retaining those employees to assist with the Chinese contracts and regulatory compliance following the Merger. She never received an answer to her inquiry. Rather, by April 2023, Virginkar and Sayer had shifted their focus entirely away from integrating Silicon Motion, and the Company laid off FE 1 shortly before the August 7, 2023 Merger closing deadline. Despite the looming deadlines for the Merger, rather than undertaking the necessary steps to successfully integrate what was to be MaxLinear's largest-ever acquisition, as of April 2023, the General Counsel and Associate General Counsel shifted their focus instead to general company-wide internal compliance trainings being rolled out between May and July 2023, and entirely ignored FE 1's repeated calls to set up merger and integration teams, prepare checklists, establish milestones, and report on progress to management and the Board. FE 1 confirmed that MaxLinear was nowhere near where it needed to be to consummate the Merger from a planning perspective

when it shifted its focus to internal trainings, and the focus never shifted back to integration planning by the time she was laid off.

112. According to the Class Action Complaint, FE 1 confirmed that she was not included in any integration planning or contract reviews after the May 5 deadline passed and the August 7 deadline grew closer, despite that, as the Director of Global Compliance, if they were happening, she would have been involved in numerous integration conversations across different business functions and would have been kept informed of integration action plans and milestones. As FE 1 explained: "There was this big acquisition supposedly on the Company's RADAR and we had not had any integration plans in place," and "based on my position as Director of Global Compliance, if [the integration plans] were in place, I would have seen them." In short, the Director of Global Compliance was not aware of any integration efforts within the Sales and Marketing, Operations, Finance, Supply Chain/Logistics, or HR departments. FE 1 explained that in her role as Director of Global Compliance she worked closely with the HR department and was "surprised" that she was completely unaware of any integration planning in HR, given that a large number of employees were set to join MaxLinear via the Merger.

113. According to the Class Action Complaint, in the crucial period leading up to the final deadline to close the deal, from May to July 2023, MaxLinear was not undertaking any review of Silicon Motion's contracts for compliance issues and lacked even the capability to review the Silicon Motion's contracts that were written in Chinese. MaxLinear did not even have any plans for reviewing those contracts following the Merger, nor did it have plans for ensuring compliance with Chinese regulations.

114. According to the Class Action Complaint, because of the widely recognized total lack of planning toward closing the Merger, according to FE 1, MaxLinear's desire not to consummate the Merger was an open secret within the Company, widely discussed in "water cooler conversations." In several of these

water cooler conversations, FE 1 heard employees discussing that MaxLinear believed it was not in the Company's economic interest to complete the Merger. Specifically, FE 1 recalled "it came up during a 'water cooler conversation' that it would be more beneficial for MaxLinear to break the merger agreement and to pay a fine rather than continue with the merger."

115. According to the Class Action Complaint, FE 1 believed that the MaxLinear's refusal to engage in any integration planning meant that management did not genuinely want to complete the transaction. When she was let go in July 2023, just weeks before the Outside Date of August 7, 2023, FE 1 queried why, if it genuinely wanted to close the deal, would MaxLinear discharge its top compliance professional given that Silicon Motion was a large foreign company with foreign-language contracts that was subject to complex domestic and foreign regulatory regimes? FE 1 understood her dismissal itself as an indication that MaxLinear did not intend to complete the Merger. She noted, after letting her go, proceeding with the Merger would have required the Company to onboard a new Director of Global Trade Compliance and to bring her up to speed remarkably quickly. But as of September 2023, when FE 1 saw a listing for her former job, the Company still had not filled her position.

116. According to the Class Action Complaint, FE 2 corroborated FE 1's recollection as to the lack of MaxLinear's Merger preparation or planning. FE 2 explained that through her departure from MaxLinear at the end of December 2022, and in spite of the fact that her division was responsible for half of MaxLinear's sales, she received no integration checklists, plans, or milestones for the Merger. She also explained in an interview with an analyst, as well as in several interviews with Lead Counsel for the Class, that MaxLinear's management chose simply to "walk away" from the Merger and instead to focus on its own business. She confirmed that, following "red flags" as to MaxLinear's declining financial health, as well as "really bad" forecasts, management "finally realized they had made a bad choice with

wanting to acquire Silicon Motion, so they tried to minimize their loss by breaking the deal."

## V. MATERIALLY FALSE AND MISLEADING STATEMENTS

117. As detailed herein, Defendants made materially false and misleading statements, and omitted material facts, in violation of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder. Defendants made SEC filings, issued press releases, disseminated analyst and investor presentations, and made oral statements including material misstatements and omissions as to the Merger, including, without limitation, Defendants' statements as to MaxLinear's intent to close the Merger following the receipt of final regulatory approvals.

118. As described herein, Defendants' statements were false and misleading when made, and omitted material facts either required to be disclosed or necessary to render Defendants' statements not misleading. The false and misleading representations and omissions alleged herein were publicly disseminated, including Plaintiffs, in media upon which reasonable investors would rely, and they were material when disseminated. These false statements and omissions created in the market a false and unrealistically positive impression of MaxLinear's intent to consummate the Merger and of the prospects of the Merger's being completed. In truth, following the downturn in MaxLinear's business prospects and the increase in cost to finance the Merger, Defendants had determined prior to the misstatements alleged herein that MaxLinear would abandon the Merger if regulatory approval was received and/or that it was relieved of its obligations under the Merger Agreement due to purported material breaches of the Agreement by Silicon Motion, and thus the deal actually had no chance of completion – a material fact that Defendants schemed to conceal from the market.

///

///

119. Defendants' material misstatements and omissions began no later than June 2, 2023.

120. On June 2, 2023, Roth MKM hosted a webinar with Defendant and MaxLinear CFO Steven Litchfield, as well as Green. An investment professional from HBK attended the webinar and heard from MaxLinear's representatives directly. The SIMO transaction was, unsurprisingly, a topic of the webinar. MaxLinear's representatives responded to several questions on the pending transaction, including about its rationale, the cash/equity mix, and macro impacts.

121. The MaxLinear representatives were directly asked whether there was conviction in the SIMO deal despite the cyclical downturn in technology and semiconductors. They responded that MaxLinear remained very interested in SIMO as an asset. Asked about the impact of interest rate increases, they responded that there were no issues with the deal and funding was committed. And in concluding remarks, MaxLinear representatives asserted that MaxLinear was excited about the acquisition and that the rationale for the deal was stronger than ever.

122. In response to a question about the regulatory process, and in particular what remediation options MaxLinear would consider, MaxLinear representatives responded that the process was straightforward and that SAMR's regulatory approval was the last item needed for deal closing.

123. During this long and comprehensive question and answer session, spanning multiple questions about the SIMO transaction, MaxLinear's representatives never mentioned, or even suggested, that a Material Adverse Event had already occurred or that MaxLinear would terminate the transaction upon the receipt of Chinese regulatory approval.

124. Following Defendants' reassurance, the price of Silicon Motion ADSs rose from $62.94, the closing price on June 1, 2023, to a close of $64.46 on June 2, 2023, and then to $66.22 on June 3, 2023, a total gain of $3.28.

125. The statements made by Litchfield and Green during the Roth MKM webinar re-affirming MaxLinear's commitment to the Merger were materially false and misleading and omitted material information when made. By the time the statements were made, Defendants had already determined not to go through with the Merger, and were merely hoping for regulators to forbid the deal. Defendants' own statements regarding their termination of the Merger admit that MaxLinear had already believed that "certain conditions in Article 6 of the Merger Agreement ***were not satisfied or waived as of May 5, 2023.***" Defendants have never stated that the conditions upon which they purported to base their termination decision were hidden from them or otherwise unknown to them. Indeed, it was only when SAMR approved the Merger that Defendants, mere hours later, represented that an MAE had occurred as of May 5, 2023 and that Silicon Motion was in breach of the Merger Agreement as of that day. Further, MaxLinear admitted it had long intended to back out of the deal, and that its announcement it was terminating the Merger was long in the making. Green later admitted that MaxLinear's decision to terminate the Merger was not made on "***the spur of the moment***" after SAMR approval, but that it was one "***the board undertook over a period of time***" after "***thoughtful consideration***," "***data analysis,***" and "***discussion***."

126. On June 6, 2023, Defendant Seendripu gave a presentation at the Stifel Conference. At that conference, Seendripu was questioned by a Stifel analyst as to whether MaxLinear was still committed to closing its Merger with Silicon Motion, asking the following question: ". . . the last topic of course is SIMO, I know there's a limitation to what you can say, but at least give us an update on the asset strategically, you talked obviously about storage and data center, right? ***So I still believe this is an asset that you're very interested in acquiring***?"

127. Defendant Seendripu reaffirmed MaxLinear's commitment to the deal without equivocation, responding that "***the basic rationale [for the Merger] has not***

***changed at all***," and that Silicon Motion was still a "***a very strategic asset for the company***":

> Look, we have some conviction [in] what we do. And I don't think we touch anything where our core technology platform doesn't expand us into the adjacent markets, right? And storage is not an adjacent market. Our primary focus [has been] the enterprise market and the data center market, and Silicon Motion is the number one merchant [] controller – storage controller supply in the world. And I don't look at controllers at storage. I look at [it] as data traffic. I look at [it] as how do you improve latency and speed of access and the amount of the memory[.] [T]oday, non-memory is monstrous, right?
>
> [] But the most important thing about the memory is if you look at the storage network is that, speed of access of the data and integrity of the data and throughput. And now it's the excel, it's going to spread all over the place as well. So you need to tightly couple the controllers with accelerators, right? And they all belong together ***and together [with Silicon Motion], we bring the portfolio to make it happen***.
>
> The other part of it is that memory is no longer about moving bits around with [the] controller, right? Talked about data integrity. So it's a lot of encryption technology, signal processing, I/O bandwidths, the mixed-signal IP [is] all common. ***So we'll get the, what they call, the technology synergy. And therefore, the R&D synergy [w]e need to, for both the companies combined together***.
>
> So we should be able to have synergies in the OpEx. ***We still are very, very, what I call, bullish that we can acquire the synergies that we told you all about.*** And yes, the revenues of the combined companies have come down [], but it just delays the, what I call, the benefits of the acquisition accordingly by a year or so. ***But the basic rationale has not changed at all. So I believe it's a very strategic asset for the company.***

128. Following Seendripu's reassurance, the price of Silicon Motion ADSs rose $2.01 per ADS, from a close of $66.22 on June 5, 2023, to a close of $68.23 on June 6, 2023, with an unusually high trading volume of 895,916 ADSs.

129. On June 7, 2023, MaxLinear filed a Form 425 with the SEC containing what it described as "excerpted portions of a transcript of the [Stifel Conference] presentation that relate to the Merger." The filing contained the above question and response.

130. MaxLinear's filing listed the "Subject Company" as Silicon Motion, leaving no doubt that Silicon Motion's securities were the subject of the statement.

131. The above-referenced statements were materially false and misleading and omitted material information when made. By the time the statements were made, Defendants had already determined not to go through with the Merger, as the "basic rationale" for the Merger changed materially from MaxLinear's point of view. In fact, Defendants no longer believed Silicon Motion was a "very strategic asset for the company," nor were they "bullish [MaxLinear could] acquire the synergies" attendant to the deal because Defendants ***knew*** they would not allow MaxLinear to complete the Merger. Indeed, Defendants' own statements regarding their termination of the Merger admit that MaxLinear purported to believe that "certain conditions in Article 6 of the Merger Agreement ***were not satisfied or waived as of May 5, 2023.***" Thus, by Defendants' own admissions, Defendant Seendripu could not possibly have held the genuine belief, as of June 6, 2023, that the Merger's "basic rationale ha[d] not changed" or that MaxLinear still planned to complete the Merger, bringing "both companies combined together." Indeed, MaxLinear admitted it had long intended to back out of the deal, and that its announcement it was terminating the Merger, which was made only ***ten hours*** after SAMR granted regulatory approval of the deal, was long in the making. Green later admitted that MaxLinear's decision to terminate the Merger was not made on "***the spur of the moment***" after SAMR approval, but that it was one "***the board undertook over a period of time***" after "***thoughtful consideration***," "***data analysis,***" and "***discussion***."

132. In fact, Defendants had decided MaxLinear would not complete the Merger well before Seendripu's statements because MaxLinear's business was deteriorating and the cost to finance the transaction had more than doubled due to increased interest rates. Thus, contrary to Seendripu's assurances that Silicon Motion remained "a very strategic asset" and MaxLinear was "very, very, . . . bullish that [it could] acquire the synergies" expected through the Merger, the opposite was true: Defendants knew that the synergies had no chance of being realized because MaxLinear was determined to terminate the Merger even if it received SAMR

approval. As further evidence that Defendants did not intend for the Merger to close, MaxLinear's former senior employees, who would have been directly involved in integrating the two companies, confirmed MaxLinear never undertook even the most basic and necessary integration steps that would be required if MaxLinear intended to complete the Merger. To the contrary, the FEs confirmed there was no integration checklists, plans, milestones, or action teams put in place from the Merger's announcement through its July 2023 termination.

133. On June 28, 2023, MaxLinear filed with the SEC a Form 8-K, signed by Defendant Litchfield. Defendants, in the Form 8-K, falsely gave the impression that MaxLinear remained committed to the Merger's consummation, including by seeking the necessary regulatory approvals to close the transaction. The Form 8-K omitted the highly material information that the Company had internally decided not to proceed with the Merger, with or without regulatory approval, and that it purportedly believed Silicon Motion was in material breach of the Merger Agreement and had suffered an MAE. The Form 8-K stated in part:

> The completion of the Merger is conditioned upon, among other things, the expiration or termination of the waiting period applicable to the consummation of the Merger under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act" and, such waiting period, the "HSR Waiting Period") MaxLinear and Silicon Motion previously filed under the HSR Act, and the HSR Waiting Period expired at 11:59 p.m. ET on June 27, 2022. ***However, since the Merger was not consummated by June 27, 2023, clearance under the HSR Act has expired, and on June 28, 2023, MaxLinear and Silicon Motion re-filed under the HSR Act.***

134. The above-referenced statements were materially false and misleading and omitted material information when made. The completion of the Merger was not "conditioned upon . . . the expiration or termination of the waiting period applicable to the consummation of the Merger under" the HSR Act because, regardless of whether the Merger received regulatory approval, MaxLinear had ***already determined*** not to go through it. Defendants failed to disclose that, at the time the

Company "re-filed" an application "under the HSR Act," they already had made the decision to terminate the Merger and had purportedly determined Silicon Motion to be in material breach of the Merger Agreement. As an FBN analyst rhetorically questioned: "if the agreement was not in force as of [May 5, 2023], why did MXL continue to perform under the agreement by refiling HSR on [June 28, 2023?]" A Wedbush analyst later noted the obvious, and false, implication of the statements in the Form 8-K: that MaxLinear's "application for [Hart Scott Rodino Act approval] on June 28th" had "impl[ied] everything was still on track as of that date."

135. The truth was, as described above, by the time of the filing of the Form 8-K, Defendants knew that closing the Merger did not make financial sense to MaxLinear, and MaxLinear thus would not consummate the Merger under any circumstances, as further evidenced by its having taken no steps to prepare for integrating the two companies. When SAMR approved the Merger, Defendants furthered their scheme by announcing that Silicon Motion had materially breached the Merger Agreement and suffered an MAE as of May 5, 2023.

## VI. ACTS IN FURTHERANCE OF DEFENDANTS' SCHEME

136. As detailed herein, Defendants carried out a common plan, scheme, and unlawful course of conduct in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder by the SEC. In an effort to avoid the severe consequences of materially breaching the Merger Agreement, including specific performance and uncapped damages, Defendants hatched a scheme to deceptively make it appear to the investing public that MaxLinear was performing under the Merger Agreement and fully intended to consummate the Merger while, in fact, its actions were all a ruse. In addition to dissemination of the above misstatements, Defendants performed various acts in furtherance of the scheme, including making sham regulatory filings indicating MaxLinear sought approval of the deal by regulators when, in fact, it was hoping to benefit from regulators killing

the deal. Defendants' actions had the effect of "pumping" the Merger, and, with it, the price of Silicon Motion's ADSs, and then "dumping" the Merger based on a feigned Silicon Motion breach when advantageous to MaxLinear to do so. Defendants' timing of the termination announcement – mere hours after SAMR approval sent Silicon Motion's ADS price soaring as a result of the scheme – left Silicon Motion's shareholders, including Plaintiffs, holding the bag.

137. Defendants' scheme consisted of creating an elaborate ruse whereby MaxLinear would outwardly appear to perform under the Merger Agreement with the intent of ultimately consummating the Merger, all while secretly having decided not to complete the Merger under any circumstances. This scheme required that Defendants would deceptively (i) make public statements showing their purported intent to consummate the Merger and (ii) perform outward acts appearing consistent with MaxLinear's obligations under the Merger Agreement.

138. The misstatements and omissions detailed in the previous section of this Complaint were made in furtherance of the scheme. The misstatements were necessary to create the outward appearance that MaxLinear was not in breach, and did not intend to breach, the Merger Agreement in order for MaxLinear to avoid the potentially devastating consequences of a breach. In essence, the misstatements took the place of the false promises of significant stock price appreciation made in a classic "pump and dump" scheme, whereby unscrupulous actors promote a security and cause it to rapidly appreciate knowing they and others who are in on the scheme intend to sell large quantities of the security when the price is sufficiently high, simultaneously cashing in on the inflated price, causing the price to drop, and leaving victims of the scheme holding the bag. Here, as described above, Defendants knew they were promoting the prospect that, upon regulatory approval, Silicon Motion investors would receive the full value of the Merger consideration. Defendants were aware this would cause a significant run-up in Silicon Motion's ADS price upon regulatory approval, while they were simultaneously aware that they would pull the

rug out from under Silicon Motion investors if and when regulatory approval was received. Thus, through the misstatements outlined in the above section, Defendants promoted a material transaction they knew was entirely illusory, causing rapid appreciation in Silicon Motion's ADS price, only to then cause its rapid fall by revealing its long-held intent to terminate the Merger.

139. But Defendants' misstatements and omissions were not alone sufficient to implement their scheme. To make the ruse believable, Defendants had to perform outward actions consistent with their statements indicating compliance with the Merger Agreement and an intent to close.

140. In furtherance of the scheme, and in order to give the impression MaxLinear remained committed to the deal, in June 2023, MaxLinear made certain submissions to SAMR as part of the regulatory review process in order to give the appearance it was committed to honoring the Merger Agreement. As reported by CMCInsight on June 21, 2023, "MaxLinear is still making efforts to address certain third-party concerns regarding [the SIMO acquisition] . . . Such efforts include submitting commitments to address supply-related concerns." These submissions were necessary to give both public observers and MaxLinear's contractual counterparty, Silicon Motion, the false impression it intended to perform under the Merger Agreement. Had MaxLinear refused to make such submissions, market observers would have (rightly) questioned MaxLinear's commitment to closing the deal, particularly in light of its diminished business prospects and increased costs of financing. Worse, failing to make these submissions could have constituted a material breach of the Merger Agreement, as MaxLinear was obligated under Section 5.6(a) of the Merger Agreement to "use its reasonable best efforts to (i) take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable … to cause the conditions to Closing to be satisfied as promptly as reasonably practicable …." In addition, Section 5.6(b) of the Merger Agreement required MaxLinear "to use its reasonable best efforts to file, as soon as practicable

and advisable after the date of [the Merger] Agreement, all applications, notices, petitions and filings required … to be filed by such party with any Governmental Agency … and to submit as promptly as reasonably practicable any additional information requested by any such Governmental Agency ….” Because the closing conditions included regulatory approval, MaxLinear had to appear to be using reasonable best efforts to obtain SAMR approval and to provide SAMR with any requested information in order to appear not to be in breach of the Merger Agreement and to keep its ruse alive.

141. In addition, and distinct from the June 28, 2023 filing of a Form 8-K with the SEC announcing it had done so, MaxLinear's re-filing with the Department of Justice under the HSR Act on June 28, 2023 constituted an act in furtherance of the scheme. Again, because regulatory approval was a condition to closing, and MaxLinear was obligated to use reasonable best efforts to promptly make required regulatory submissions and to cause the closing conditions to be satisfied, failing to re-file under HSR would have tipped off the public to Defendants' scheme and breached the Merger Agreement, subjecting MaxLinear to the full suite of the Merger Agreement's severe remedies.

## VII. <u>ADDITIONAL SCIENTER ALLEGATIONS</u>

142. The facts alleged herein give rise to a strong inference that Defendants knew or recklessly disregarded that their statements and omissions regarding the Merger and MaxLinear's intent to consummate the Merger were materially false and misleading when made and that they knowingly and/or recklessly undertook a scheme to falsely give the appearance of MaxLinear's intent to close in an attempt to avoid the consequences of terminating and breaching the Merger Agreement. In addition to the allegations set forth above, these particularized facts include the following.

143. *First*, Defendants' own admissions give rise to a strong inference that, by no later than May 5, 2023, Defendants had made the determination that MaxLinear would not consummate the Merger. MaxLinear's July 26, 2023 notice of termination, disseminated mere hours after receiving SAMR approval, claimed that "the First Extended Outside Date ha[d] passed and was not automatically extended because certain conditions in Article 6 of the Merger Agreement ***were not satisfied or waived as of May 5, 2023***." Thus, Defendants' own notice of termination includes the admission that whatever condition(s) MaxLinear purports to cite in an attempt to justify its termination of the Merger existed in advance of May 5, 2023. MaxLinear's statement, and subsequent public statements, do not say or even suggest that whatever purported unspecified breaches on the part of Silicon Motion had occurred by May 5, 2023 were concealed until some later date. Nor do any of MaxLinear's statements regarding its sudden termination of the Merger attempt to explain why, if Silicon Motion was in breach prior to May 5, 2023, MaxLinear did not provide notice of a breach to Silicon Motion at any point, or why it did not disclose the breach until nearly three months later, and mere hours following SAMR approval. Indeed, MaxLinear has never asserted that the purported breach it claims existed no later than May 5, 2023 was hidden from it. In fact, MaxLinear has never explained the timeline of the announcement even though doing so would inure to its benefit, as Silicon Motion, analysts, market commentators, and investors have raked Defendants over the coals for their obvious deception as to its intent to consummate the Merger.

144. *Second*, MaxLinear's termination of the Merger only ten hours after SAMR granted approval of the Merger strongly indicated it was SAMR's approval, not unspecified events occurring prior to May 5, 2023, that precipitated the termination. MaxLinear waited fifteen months for SAMR to make its decision as to whether it would approve the deal, and repeatedly assured investors that it was actively seeking and looking to obtain SAMR approval by mid-2023. However, following SAMR's approval within that timeframe, Defendants promptly terminated

the Merger ***that very same day***. On August 1, 2023, MaxLinear's head of Investor Relations, Leslie Green, admitted MaxLinear's termination decision was not made on "the spur of the moment," but rather was one "the board undertook over a period of time" after "thoughtful consideration," "data analysis," and "discussion." Thus, Defendants admittedly did not suddenly learn of pre-existing breaches of the Merger Agreement following SAMR approval, nor did MaxLinear provide notice to Silicon Motion of the purported breaches whenever it did learn of any purported breaches. In fact, Defendants had determined long before SAMR approval that MaxLinear would not go through with the Merger and SAMR's decision merely removed their hoped-for easy out, forcing their hand in causing MaxLinear to back out of the deal.

145. *Third*, and as noted above, despite MaxLinear's attempt to blame the termination on purported breaches of the Merger Agreement by Silicon Motion, an MAE, and/or Silicon Motion's failure to satisfy closing conditions, MaxLinear never notified Silicon Motion in writing of its purported inability to satisfy any closing conditions, breaches or MAEs. Section 5.7 of the Merger Agreement required MaxLinear to provide "***prompt notice***" whenever it became "aware of the occurrence of an event that could prevent or delay beyond the Outside Date (as the same may be extended) the consummation of the Transactions or that would reasonably be expected to result in any of the conditions to the Merger set forth in Article 6 not being satisfied." Defendants were, accordingly, required to promptly notify Silicon Motion as soon as they determined that Silicon Motion suffered an MAE, that there were unsatisfied closing conditions, or that the First Extended Outside Date was not extended as of May 5, 2023.

146. Similarly, if Silicon Motion was "in material breach of representations, warranties, covenants, and agreements in the Merger Agreement," MaxLinear could not terminate the Merger Agreement without "deliver[ing] to [Silicon Motion] written notice of such breach" and providing "at least thirty (30) days" to cure the purported breach "in all material respects." MaxLinear has never disputed that it

never provided the contractually required notice to Silicon Motion. MaxLinear's failure to notify Silicon Motion in writing of its purported breaches, MAEs, and closing condition deficiencies further demonstrates that Defendants merely concocted these purported conditions and deliberately and intentionally concealed from investors, including Plaintiffs, their intent to back out of the Merger.

147. *Fourth*, MaxLinear had strong financial motives to undertake its scheme to hide its intent not to complete the Merger pending SAMR's review. The economics of the Merger had soured for MaxLinear (which was not a valid reason for MaxLinear to terminate the deal) because MaxLinear's financing costs had more than doubled under its loan commitment due to the significant run-up in interest rates following the Merger's announcement. Indeed, the rise in interest rates would have increased MaxLinear's annual financing costs from the originally contemplated $110 million to $250 million.

148. This significant additional expense would have strained MaxLinear's diminishing revenues, which were in freefall following the announcement of the Merger. As analysts noted, SAMR's approval came during "the absolute downturn" in MaxLinear's financial prospects. Defendants were aware MaxLinear would not see any significant turnaround in its business anytime soon. According to the Class Action Complaint, FE 2 explained that senior management, including Defendants Seendripu and Litchfield, learned in September 2022 that MaxLinear was forecasting an enormous 40% decline in revenues in 2023. But MaxLinear could not simply terminate the Merger Agreement, as doing so would have constituted a "Willful and Material Breach," subjecting MaxLinear to uncapped damages or, worse, specific performance, forcing MaxLinear to close the deal Defendants so desperately wanted to avoid. Thus, Defendants held out hope that SAMR would either deny approval or delay its decision beyond the August 7, 2023 Outside Closing Date, providing MaxLinear with an easy out. If that occurred, MaxLinear would be able to avoid the specific performance, walk away from the transaction, and potentially limit its

exposure to a one-time $160 million breakup fee, if not at a significant discount to that amount.

149. All of these factors—the increased recurring financing costs, the Merger's delay with its closing occurring during a severe downturn in MaxLinear's business, and the severe remedies available to Silicon Motion if MaxLinear breached the Merger Agreement ahead of SAMR's decision whether or not to approve the deal—provided Defendants a strong financial motive to carry out their scheme to give the outward appearance of compliance with the Merger Agreement and misleading investors as to MaxLinear's commitment to the Merger, despite having internally determined not to go through with the financially ruinous Merger.

150. *Fifth*, MaxLinear's failure to undertake even rudimentary integration planning for the largest acquisition in its history strongly corroborates that Defendants were internally committed to abandoning the deal. According to the Class Action Complaint, FE 1 repeatedly raised this issue with MaxLinear's senior management, including the Company's General Counsel, starting as early as November 2022. She continued to inquire of senior management as to this "red flag" every six weeks thereafter. FE 1 explained that, even as of July 18, 2023—a mere eight days before the Merger was terminated—"[t]here was no plan and no action team in place" at MaxLinear, including in the key Regulatory Compliance, Finance, Supply Chain/Logistics, and HR departments. FE 1 explained that the documents relating to more than 40% of Silicon Motion's transactions were written in Chinese and MaxLinear did not have employees who could review them; that Silicon Motion offered to make its personnel capable of reviewing and translating the contracts available to MaxLinear during a transition period; but that MaxLinear not only declined to take any action on this offer, but it ***laid-off*** FE 1 – its top compliance officer with more than twenty-five years experience in global trade, logistics, and regulatory compliance, including direct involvement in numerous M&A transactions – just weeks before the August 7, 2023 closing deadline. MaxLinear's failure to

engage in any integration efforts as late as July 2023, as well as its termination of its Director of Global Compliance and failure to name a successor, further reinforces that Defendants had no intention of closing the Merger as of the time of their misstatements and acts in furtherance of the scheme as described herein.

151. *Sixth*, Silicon Motion's response to MaxLinear's unilateral termination of the Merger – which, among other things, includes repeated and strenuous denial of MaxLinear's purported grounds for terminating the deal and its confirmation that MaxLinear "never once" provided notice or "ever mention[ed]" any of these purported grounds "[i]n the 15 months following the signing of the Merger Agreement" – further reinforces that Defendants acted with scienter. Defendants had made the decision not to proceed with the Merger, regardless of SAMR's decision, and only announced MaxLinear's purported (and concocted) grounds for termination after SAMR's approval deprived MaxLinear of its easy out. MaxLinear's failure to notify Silicon Motion of any purported grounds to terminate the Merger (which grounds it claims were present by May 5, 2023) until immediately after SAMR's approval supports a cogent and compelling inference of scienter.

152. *Seventh*, analysts and market observers examining the information available publicly have arrived at the conclusion that Defendants deceived the market as to their intentions regarding the Merger. Analysts rightly seized on MaxLinear's claim that it determined Silicon Motion was in material breach and suffered an incurable MAE "as of May 5, 2023," despite (i) giving investors reassurances on June 2 that the deal would close, (ii) re-affirming on June 6, 2023 that MaxLinear was "very, very bullish" on the deal and the targeted closing timeline, and (iii) its re-filing of the HSR application on June 28, 2023. FBN, for example, called into question Defendants' "***credibility***" for "describ[ing] the agreement in its releases and filings as still in force" and "refil[ing the] HSR [application]" mere weeks before terminating the Merger. Wedbush took Defendants to task for not taking "action to terminate the deal around May 5th" and "implying everything was still on track" with

its HSR filing. Multiple other analysts were shocked by MaxLinear's near-immediate termination of the deal "so closely on the heels of the SAMR approval," after Defendants had led the market to believe approval was the "final roadblock preventing a deal." Numerous analysts also expressed their conclusion that Defendants deceived investors as to their actual reasons for terminating the Merger, with FBN calling Defendants' behavior "blasphemous" and multiple analysts noting the obvious conclusion that MaxLinear simply had "***buyers' remorse.***" Analysts' scathing reactions to Defendants' material misstatements and omissions, sudden termination of the Merger following SAMR approval, and deceit as to the actual reasons for termination – *i.e.*, their near-uniform conclusion from available facts that Defendants knowingly deceived investors – is but another factor demonstrating a cogent and compelling inference of scienter.

153. *Finally*, the multi-billion-dollar Merger was a transformative deal and would have been MaxLinear's largest-ever acquisition, by far. The Merger would have doubled MaxLinear's addressable market, it was expected to be "immediately and materially accretive" to MaxLinear's operating income, operating margins, earnings per share, and cash flow, and it would have elevated MaxLinear into a world-leading "top-ten fabless semiconductor supplier." The deal also would have resulted in Silicon Motion's shareholders receiving a substantial premium to its pre-deal ADS price. For these reasons, analysts and investors were intensely focused on the Merger and its prospects for completion, they asked Defendants pointed questions relating to the Merger and its prospects, and Defendants repeatedly responded to these inquiries by affirming MaxLinear's commitment to closing the Merger consistent with the expected timeframe. Further, Seendripu was the Chairman of MaxLinear's Board at all relevant times and by virtue of his position was directly involved in, and essential to, the decision to terminate, which was made per MaxLinear's own admissions, following "thoughtful consideration," "data analysis" and "discussion," which decision "the Board undertook over a period of time." It is

therefore implausible to suggest that Seendripu, Litchfield, and other members of MaxLinear's executive management team would be unaware of MaxLinear's lack of commitment to closing the deal, particularly as late as June 2023.

## VIII. ADDITIONAL MATERIALITY ALLEGATIONS

154. Analysts covering Silicon Motion included the probability of the merger being completed in their models. In discussing the risks of the Merger not being completed, analysts focused solely on the risk that Chinese approval would not occur (thus resulting in deal failure). Analysts did not analyze, or for the most part even contemplate, a risk that Chinese approval would occur but MaxLinear would pull out of the deal anyway.

155. Analysts and market commentators were focused on the August 7, 2023 Second Outside Date. CMC Insights, which was closely following the deal, ended multiple reports highlighting that if approvals were not received by August 7, 2023, MaxLinear could walk away without penalty.

156. Analysts covering Silicon Motion were focused on the receipt of regulatory approvals, and not MaxLinear's cold feet, as a risk to the deal. For example, in writing about the deal in a May 2023 note, analysts at B. Riley commented that the deal "awaits China's SAMR approval," and made no mention of MaxLinear's intention to close as part of the calculus as to the likelihood of the deal actually closing.

## IX. PLAINTIFFS' ACTUAL RELIANCE

157. Plaintiffs are managed by HBK Investments L.P., an SEC-registered investment adviser. HBK Management LLC is the general partner of HBK Investments L.P. (together "HBK Management").

158. Plaintiffs, through HBK Management, actually read or heard, reviewed, and justifiably relied on the representations and publicly available and reported acts

in furtherance of the scheme set forth above prior to purchasing Silicon Motion securities to the extent each such statement had been made at the time of purchase or act had been taken prior to the time of purchase.

159. Prior to purchasing Silicon Motion securities on behalf of Plaintiffs, an investment professional at HBK Management actually read or heard, reviewed, and justifiably relied on MaxLinear's SEC filings as well as Defendants' other public disclosures.

160. Each of Defendants' statements was material to HBK Management's decision to purchase Silicon Motion securities on behalf of Plaintiffs.

161. Plaintiffs' reliance on Defendants' statements and their acts in furtherance of the scheme was reasonable and justifiable. Plaintiffs were open-market purchasers of Silicon Motion securities that did so based on Defendants' representations and acts.

162. Had HBK Management known the truth, it would not have caused Plaintiffs to purchase Silicon Motion securities or, if it had done so, would not have caused Plaintiffs to purchase at the prices it did.

163. HBK Management's intention in purchasing Silicon Motion securities was to have Plaintiffs hold those securities through the conclusion of the merger, at which time Plaintiffs would have received both cash and MaxLinear stock, making them putative future shareholders of MaxLinear at the time of purchase.

## X. APPLICATION OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

164. At all relevant times, the market for Silicon Motion ADSs was an efficient market for the following reasons, among others:

a) Silicon Motion ADSs met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient and automated market;

b) Silicon Motion's Form 20-F for the fiscal year ended December 31, 2022, stated that Silicon Motion had more than 132 million ordinary shares outstanding as of December 31, 2022, which corresponded to approximately 33 million ADSs;

c) As regulated issuers, MaxLinear and Silicon Motion filed periodic public reports with the SEC as required by law;

d) MaxLinear and Silicon Motion communicated with public investors regularly through established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services, the internet, and other wide-ranging public disclosures; and

e) Unexpected material news about Silicon Motion was rapidly reflected in and incorporated into the price for Silicon Motion ADSs during the relevant period.

165. As a result of the foregoing, the Silicon Motion ADS market promptly incorporated current information regarding Silicon Motion from publicly available information sources and such information was reflected in the price of Silicon Motion ADSs. Given these circumstances, a presumption of reliance applies.

166. A presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because Plaintiffs' claims are based, in part, on Defendants' material omissions.

## XI. LOSS CAUSATION

167. As set forth herein, Defendants made materially false and misleading statements and omissions and engaged in a scheme and an unlawful course of conduct to deceive the market, which artificially inflated the price of Silicon Motion ADSs, maintained inflation in the price of Silicon Motion ADSs, and operated as a fraud or deceit on purchasers of Silicon Motion ADSs by misrepresenting the value of Silicon Motion's securities by falsely affirming MaxLinear's commitment to complete the Merger and concealing its actual decision to terminate the Merger Agreement regardless of whether the Merger received regulatory approval.

168. Plaintiffs purchased Silicon Motion ADSs at artificially inflated prices during the relevant period. But for Defendants' fraudulent scheme and material misrepresentations and omissions, Plaintiffs would not have purchased Silicon Motion ADSs at all, or at least not for the prices they paid.

169. As Defendants' misrepresentations and fraudulent scheme became known to the market, the price of Silicon Motion ADSs fell dramatically as the prior artificial inflation was removed from the ADSs' price. The disclosure described below, however, is not necessarily an exhaustive list of all ADS price declines attributable to Defendants' fraudulent conduct, given that fact and expert discovery in this case has yet to commence. Plaintiffs expressly reserve the right to identify additional relevant disclosures and price declines following an opportunity to conduct full fact and expert discovery in this case.

170. On July 26, 2023, at 3:10 PM, MaxLinear filed a Form 8-K accompanied by a press release revealing that MaxLinear was terminating the Merger Agreement, less than ten hours after SAMR had provided its authorization for the Merger, and all other regulatory approvals required to close the deal had been obtained.

171. On this news, Silicon Motion's ADS price plummeted from an intra-day high of $95.33 per ADS on July 26, 2023, to close at just $65.35 per ADS on July 26, 2023, a decline of $29.98 per ADS, or 31%, on a massive trading volume of 17,771,620 ADSs. Silicon Motion ADS price continued its fall when the market opened the following day, declining an additional $12.84 to close at $52.51 per ADS on July 27, 2023, again on a very high trading volume of 9,116,569 ADSs, and representing a two-day[6] decline of over 44% or nearly $43 per ADS from the July 26 intra-day high.

---

[6] Measured from the $95.33 per ADS market high on July 26, 2023.

172. As a result of their purchases of Silicon Motion ADSs, Plaintiffs suffered damages.

## XII. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE

173. The statutory safe harbor or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this Complaint. The statements alleged to be false or misleading herein were not "forward-looking statements" nor were they identified as "forward-looking statements" when made, but rather related to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false or misleading may be characterized as forward-looking, they were not adequately identified as forward-looking statements when made, and there were no meaningful cautionary statements identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements.

174. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, each Defendant had actual knowledge that the particular forward-looking statement was materially false or misleading. Defendants are liable for the statements pleaded because, at the time each of those statements was made, Defendants knew the statement was false, and the statement was authorized and/or approved by an executive officer and/or director of MaxLinear who knew that such statement was false when made.

///

///

///

## XIII. CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

**For Violation of § 10(b) of the Exchange Act and SEC Rule 10b-5(a) and (c)**

**(Scheme Liability)**

**Against All Defendants**

175. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

176. This Count is asserted against all Defendants for violating Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(a) and (c) promulgated thereunder by the SEC.

177. Defendants carried out a common plan, scheme, and unlawful course of conduct that was intended to, and did: (i) deceive the investing public, including Plaintiffs; (ii) artificially inflate the price of Silicon Motion securities; and (iii) cause Plaintiffs to purchase Silicon Motion securities at inflated prices.

178. In furtherance of this unlawful plan, scheme, and course of conduct, Defendants employed devices, schemes, and artifices to defraud, and knowingly and/or recklessly engaged in acts, transactions, practices, and courses of business that operated as a fraud and deceit upon Plaintiffs in connection with their purchases of Silicon Motion securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder.

179. Defendants' fraudulent devices, schemes, artifices, and deceptive acts, practices, and course of business included its knowing and/or reckless concoction and execution of a concealed plan to avoid consequences for its planned breach of the Merger Agreement (including specific performance), including by causing MaxLinear to apply for regulatory approval of the Merger, including with Chinese and U.S. authorities, despite knowing that MaxLinear was not committed to and would not consummate the Merger, including filing a Form 10-K with the SEC disclosing that "MaxLinear and Silicon Motion re-filed under the HSR Act," thereby

deceiving Silicon Motion investors into believing it intended to consummate the Merger.

180. Plaintiffs reasonably relied upon the integrity of the market in which Silicon Motion's securities traded.

181. At the time of Defendants' fraudulent scheme and unlawful course of conduct alleged herein, Plaintiffs were unaware of the fraudulent scheme and unlawful course of conduct and/or the impact of the fraudulent scheme. Had Plaintiffs been aware of Defendants' fraudulent scheme and unlawful course of conduct, they would not have purchased Silicon Motion securities, or they would not have done so at the artificially inflated prices paid for such securities.

182. As a direct and proximate cause of Defendants' fraudulent scheme and unlawful course of conduct, Plaintiffs suffered damages in connection with their purchases of Silicon Motion securities.

183. By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder and are liable to Plaintiffs for their resulting damages.

## SECOND CAUSE OF ACTION

**For Violation of § 10(b) of the Exchange Act and SEC Rule 10b-5**

**(Misstatement Liability)**

**Against All Defendants**

184. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

185. This Count is asserted against all Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

186. As specified herein, Defendants individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, made or were responsible for the making of various untrue statements of

material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

187. Defendants participated directly or indirectly in the preparation and/or issuance of the SEC filings, press releases, conferences with analysts and investors, and other documents and statements described herein, including statements that were made to securities analysts and the media and that were designed to, and did, influence the market for Silicon Motion securities. Such reports, filings, releases, and statements were materially false or misleading in that, among other things, they misstated MaxLinear's intent to comply with the Merger Agreement and complete the Merger and acquire Silicon Motion and they failed to disclose that, in fact, Defendants had determined that MaxLinear would terminate the Merger, and would not acquire Silicon Motion per the terms of the Merger Agreement, regardless of whether the Merger received regulatory approval.

188. Defendants acted with scienter in that they had actual knowledge of the misrepresentations and omissions of material fact alleged herein, or recklessly disregarded that the true facts were available to them. Defendants engaged in this misconduct to conceal from the investing public their intent to cause MaxLinear to not complete the Merger and acquire Silicon Motion in accordance with the Merger Agreement.

189. Defendants' dissemination of materially false and misleading information and failure to disclose material facts artificially inflated and maintained the market price of Silicon Motion ADSs.

190. Plaintiffs have suffered damages in that, in direct reliance on the integrity of the market in which Silicon Motion's ADSs trade, they paid artificially inflated prices for Silicon Motion ADSs, which inflation was removed from its price when the true facts became known. Plaintiffs would not have purchased Silicon Motion ADSs, or at the prices they paid, if they had been aware that the market price

had been artificially and falsely inflated by Defendants' misleading statements and fraudulent course of conduct.

191. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs suffered damages attributable to the material misstatements and omissions alleged herein in connection with their purchases of Silicon Motion ADSs.

**THIRD CAUSE OF ACTION**

**For Violation of §20(a) of the Exchange Act**

**Against The Individual Defendants**

192. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

193. This Count is asserted against the Individual Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a).

194. Defendants Seendripu and Litchfield were and acted as controlling persons of MaxLinear within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's actual operation and intentions regarding the Silicon Motion Merger, and their power to control public statements about the Silicon Motion Merger, Defendants Seendripu and Litchfield had the power to influence and control, and did actually influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various misstatements and omissions of material fact herein and the conception and carrying out of the scheme described herein. Each of Defendants Seendripu and Litchfield was provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged to be materially false or misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

195. As set forth above, MaxLinear violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by its acts and omissions as alleged in this Complaint.

196. By virtue of their controlling positions of MaxLinear and as a result of their own aforementioned conduct, Defendants Seendripu and Litchfield are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, MaxLinear is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Plaintiffs. Moreover, as detailed above, each of the Individual Defendants culpably participated in the material misstatements and omissions alleged herein.

197. As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their purchases of Silicon Motion ADSs.

## FOURTH CAUSE OF ACTION

### For Violation of §18 of the Exchange Act

### Against All Defendants

198. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

199. As alleged herein, Defendants caused statements to be made in MaxLinear's June 28, 2023 Form 8-K that were, at the time an in light of the circumstances under which they were made, false or misleading with respect to material facts.

200. An investment professional working on behalf of Plaintiffs read and actually relied upon information contained in the June 28, 2023 Form 8-K in making each purchase of Silicon Motion ADSs.

201. Unaware of the false and misleading nature of Defendants' statements, or of the true facts, Plaintiffs purchased Silicon Motion ADSs in actual, justifiable,

eyeball reliance upon the representations made by Defendants in the June 28, 2023 Form 8-K.

202. Defendants' false and misleading statements and omissions of material fact artificially inflated the price of Silicon Motion ADSs.

203. Had they known the true facts, Plaintiffs would not have purchased Silicon Motion ADSs and/or would not have purchase them at the inflated prices they paid.

204. Upon disclosure of the true facts, the price of Silicon Motion ADSs dropped, and Plaintiffs have suffered damages in an amount to be proven at trial.

205. By reason of the foregoing, Defendants are liable to Plaintiffs for violation of Section 18 of the Exchange Act, 15 U.S.C. § 78r.

## FIFTH CAUSE OF ACTION

**Common Law Fraud**

**Against All Defendants**

206. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

207. Defendants made, authorized, or caused the representations and/or omissions set forth above.

208. Those representations and omissions were material.

209. The material misrepresentations set forth above were knowingly made by such Defendants with the intent to deceive, and such Defendants' misrepresentations omitted and concealed material statements of fact from Plaintiffs.

210. Each such Defendant knew his or its representations were false and/or misleading, and their omissions were material and rendered their representations misleading at the time they were made or omitted.

211. Defendants knew that investors like Plaintiffs would receive and rely on such representations and intended that their false and/or misleading statements and

omissions would induce Plaintiffs to purchase Silicon Motion ADSs at inflated prices.

212. Plaintiffs reasonably and justifiably relied on such misrepresentations and omissions. Plaintiffs would not have purchased Silicon Motion ADSs at all, or at the prices they paid, had they known the true facts regarding, *inter alia*, Defendants' scheme to make it appear as though MaxLinear intended to comply with the Merger Agreement and complete the Merger when it actually intended not to complete the Merger regardless of whether it received regulatory approval.

213. As a direct and proximate result of such reliance, and Defendants' fraudulent misconduct, Plaintiffs have suffered damages.

214. Moreover, based on the intentional, malicious, willful and wanton conduct alleged herein, which indicates that Defendants acted with improper motive and/or vindictiveness, Plaintiffs seek punitive damages in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION

### Common Law Negligent Misrepresentation

### Against All Defendants

215. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

216. Defendants authorized or caused the representations and/or omissions set forth above.

217. Defendants supplied false information for Plaintiffs to use in making investment decisions.

218. Defendants had no reasonable grounds for believing the representations were true when made.

219. Defendants had a duty to exercise reasonable care and competence in providing information about MaxLinear's intent to complete the Merger and acquire Silicon Motion to Plaintiffs.

220. Defendants made misrepresentations that they knew, or should have known, to be false in order to induce investors, including Plaintiffs, to purchase Silicon Motion ADSs.

221. Defendants breached their duty to exercise reasonable care in making these misrepresentations to Plaintiffs.

222. Plaintiffs reasonably and justifiably relied on such misrepresentations. Plaintiffs would not have purchased Silicon Motion ADSs, or at the prices they paid, had they known the truth.

223. As a direct and proximate Defendants' conduct, Plaintiffs have suffered damages.

## SEVENTH CAUSE OF ACTION

### Violations of Cal. Civ. Code § 1709

### Against All Defendants

224. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

225. During the relevant period, the Defendants, individually and in concert with others, participated in the fraudulent scheme set forth therein and made, or caused MaxLinear to make, statements which, at the time and in light of the circumstances they were made, were materially false and misleading representations of fact, or omitted to state material facts which they had a duty to disclose to Plaintiffs and the investing public.

226. Defendants had a duty to disclose the truth because where a person or entity voluntarily discloses information, it must disclose the whole truth; when a person or entity makes a representation and new information makes that earlier misrepresentation misleading or untrue, it must disclose the whole truth; and when a person or entity makes a partial disclosure and conveys a false impression, it must disclose the whole truth. Defendants voluntarily disclosed information concerning MaxLinear's intent to acquire Silicon Motion through the Merger that disclosed only

partial, deceptive information and half-truths. Accordingly, Defendants had a duty to tell the whole truth.

227. When making the false and misleading representations, Defendants knew they were false or made them with reckless disregard for their truth.

## XIV. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

a) Awarding Plaintiffs damages in an amount which may be proven at trial, together with interest thereon;

b) Awarding Plaintiffs pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

c) Awarding Plaintiffs punitive damages in an amount to be determined at trial; and

d) Awarding such other relief as deemed appropriate by the Court.

## XV. JURY DEMAND

Plaintiffs demand a jury by trial on all issues so triable.

Dated: June 13, 2024

Respectfully submitted,

**ROLNICK KRAMER SADIGHI LLP**
Lawrence M. Rolnick
Marc B. Kramer
Steven M. Hecht
Michael J. Hampson

**DUCKOR METZGER & WYNNE,**
A Professional Law Corporation

By: */s/ John C. Wynne*

Attorneys for Plaintiffs,
HBK MASTER FUND L.P. and
HBK MERGER STRATEGIES MASTER FUND L.P.